[S.F. No. 24601. June 30, 1986.]

BRYAN W. STEVENS, Plaintiff and Respondent, v.
DWIGHT GEDULDIG et al., Defendants and Appellants.

**COUNSEL**

John K. Van de Kamp, Attorney General, Richard D. Martland and N. Eugene Hill, Assistant Attorneys General, Vance W. Raye and Geoffrey L. Graybill, Deputy Attorneys General, for Defendants and Appellants.

Stanley M. Sapiro for Plaintiff and Respondent.

**OPINION**

**BROUSSARD, J.**—In a taxpayer's suit, defendants Dwight Geduldig, Charles Hobbs and Lewis Uhler were found personally liable to the State

of California for the unlawful expenditure of state funds.[1] We reverse the judgment, holding (1) that because cash expenditures from the state agencies involved were reimbursed from funds appropriated for the Governor's office, the agencies incurred no damage on which to predicate liability, and (2) the evidence before the trial court was insufficient to support a judgment based on in-kind contributions of personnel and material. Our opinion follows in large part the views stated by Justice Blease for the Court of Appeal, Third Appellate District.

In August or September of 1972, former Governor Ronald Reagan determined that three task forces should be established to study criminal justice, local government, and taxes. The tax reduction task force was created to study all aspects of state taxing and spending. Uhler was named chairman, and he resigned his position as assistant secretary of the Human Relations Agency (now the Health and Welfare Agency) and was appointed a special assistant to the Governor. Hobbs was named a member of the task force, and he resigned his position as the chief deputy director of the Department of Social Welfare and also was appointed a special assistant to the Governor. The third member of the task force, although named a defendant, was not served with process. In addition, two secretaries worked full time for the task force. Frank Walton, Secretary of the Business and Transportation Agency, was appointed chairman of the task force steering committee, which included several governmental officials. The task force also had about 20 advisors, primarily academicians. At cabinet meetings and special meetings with department directors, the Governor asked for departmental cooperation and encouraged everyone "to lend every possible assistance" to the task force.

So far as appears, the salaries of the task force members were charged to the appropriation for the support of the Governor and his office. The task force did not have a budget of its own. A substantial part of its activities was subsidized by contributions from a private foundation.

To permit the task force to retain outside consultants and pay for miscellaneous expenses, arrangements were made to use the revolving fund of the Department of Health Care Services. On September 1, 1972, Uhler, apparently on behalf of the Department of Health Care Services[2] and as chairman of the task force, entered into an agreement with the Department

---

[1] Judgment was entered against Uhler for $94,231, against Geduldig and Hobbs for $18,652.89 and against Geduldig for $8,703.21. In addition, attorney fees of $18,750 were awarded against all three.

[2] Uhler signed the agreement two lines below the designation of Health Care Services as a contracting party. His title as chairman of the task force appeared immediately below his signature.

of Social Welfare at an estimated cost of $30,000 for analysis of the tax impact on welfare spending including the availability and appropriateness of tax resources for welfare-related programs. The agreement specified that the source of the funds was item 255 of the budget, which is the administrative appropriation for the Department of Social Welfare. An accounting officer certified that budgeted funds were available, and the contract was approved by the Department of General Services by a representative of the chief counsel. The contract provided that the Department of Social Welfare would reimburse the Department of Health Care Services.

At the time Uhler was neither an officer nor employee of the Department of Health Care Services. According to Uhler, the Department of Health Care Services was made a party to the agreement so that the department's revolving fund could be used for the accounting of task force expenses. The department was chosen because it could take on such responsibilities without significantly affecting its workload.[3]

On October 1, 1972, Geduldig, the Director of the Health Care Services Department, signed a document purportedly delegating to Uhler "the authority and power to receive and sign for on my behalf all contracts and accounting documents pertinent to the Governor's Tax Reduction Task Force." The delegation was limited to the sum specified in the earlier contract. Uhler was not an officer or employee of the Department of Health Care Services at the time of the delegation.

Uhler did not use the entire $30,000. He entered into five contracts with consultants between October 1, 1972, and January 1, 1973, who were paid a total of $8,703.21 from the Health Care Services revolving fund. The consultants provided services which were not limited to analysis of tax impact and spending on health care and welfare services, but related to other aspects of state taxing and spending as well.[4] The Health Care Services revolving fund was not reimbursed by the Social Welfare Department as provided by the September 1 contract. Nothing appears in the record as to

_____

[3]Although Uhler did not testify why the Department of Social Welfare could not process contractual payments without significantly affecting its workload, it appears that during the 1972-1973 fiscal year, the state personal income tax withholding was to be processed through the Department of Social Welfare under contract with the Franchise Tax Board. (See 1972-1973 Governor's Budget, p. A-49.) Perhaps this burden explained the use of Health Care Services accounting facilities for transactions which ultimately were to be paid by the Department of Social Welfare.

[4]One contract for $2,500 was for the development of methods to finance public schools, and another for nearly $5,000 was for the development of plans for an implementing organization. Smaller contracts were entered into for economic analysis of tax and spending programs and graphic illustrations. A number of other contracts were entered into, but no state funds were paid pursuant to them.

why the Controller did not make the transfers. Instead the revolving fund was reimbursed by the Governor's office, in October 1973, after the filing of the instant lawsuit.

In November 1972, Hobbs determined to leave state employment and become a private consultant. He discussed this possibility with Michael Deaver of the Governor's staff who suggested he enter into a consultant contract and talk to Geduldig, who was then either the Director or deputy director of the Department of Human Resources Development. Hobbs told Geduldig that his consultant work would include the study of unemployment and disability insurance and would also encompass "all types of taxation." On December 1, 1972, Hobbs executed a consultant contract with the Human Resources Development Department. Payments were not to exceed $16.25 per hour. The source of payment under the contract was budget item 240, an appropriation for the "administration of unemployment compensation disability benefits . . . payable from the Unemployment Compensation Disability Fund." (Stats. 1972, ch. 156, item 240, p. 288.) The contract was signed by an accounting officer whose authority to execute contracts is not challenged.

Pursuant to the contract, Hobbs performed consultant services for the task force, including, but not limited to, studies of unemployment and disability insurance. He received $18,652.59 for expenses and fees from the Human Resources Development Department. In October 1973, the Unemployment Disability Fund administered by the Human Resources Development Department also was reimbursed by the Governor's office.

The task force also received "in-kind" contributions from, and the services of personnel employed by, the Business and Transportation Agency, Health and Welfare Agency, Governor's office, and the Department of Finance. In a report to the Governor, Uhler estimated the value of the "in-kind" contributions as $13,728 and the personnel as $99,654. The personnel contributed by the agencies included a secretary, a statistician, and researchers.

The task force continued in existence until June 1973. It undertook to analyze state taxing and spending programs and to consider various alternatives for the reduction of spending and taxes. In November or early December 1972, it concluded that the best means of achieving a tax reduction was by a constitutional amendment and recommended to the Governor a proposal for a constitutional tax limitation measure. In early January, the Governor directed the task force to draft a constitutional amendment to be presented to the Legislature. The task force worked on the language of the amendment in late January and February. Uhler testified that over a 30-day

period he worked on the amendment, and he was assisted by about 40 state officials and employees. Hobbs testified that he spent between 10 and 20 percent of his time working on the amendment.

On March 8, 1973, the proposed amendment was introduced in the Legislature as proposed Constitutional Amendment 12. The task force participated in legislative hearings on the amendment and continued its studies of taxes and spending. In April, however, the Governor concluded that the Legislature was unreceptive to the proposed constitutional amendment, and decided to submit the measure to the electorate as an initiative. During the effort to qualify the measure for the ballot, the task force continued in their uncompleted studies of taxes and spending. Uhler denied that he worked on the initiative on state time. He said he gave some speeches and engaged in some debates before universities and other organizations but was careful to separate the work of the task force from any involvement with the initiative measure. On several weekends he gathered signatures for the initiative with his children.

Hobbs concluded his work under the contract at the end of May 1973. Uhler left state employment at the end of June. The third member of the task force had resigned from state employment in April. After terminating their relationships with the task force, all three worked on the initiative.

The trial court determined that Uhler obtained personnel and in-kind support from several state agencies which was not authorized by any budget appropriation. The trial court also found that the budget did not contain any available appropriations which could be used for the purposes of the Uhler and Hobbs contracts. The trial court also made a number of determinations to the effect that the contracts violated state contracting procedures: Uhler was not an officer, employee, or agent of the Department of Health Care Services when he executed the September 1 contract on behalf of the department; Geduldig had no authority to delegate to Uhler authority to sign contracts on behalf of the department; Uhler had no authority to execute the five contracts with the consultants; certifications in these contracts that there was compliance with the State Administrative Manual were false, and all contracts should have been submitted to the Department of Finance.

The court also determined that the money expended under the contracts was reimbursed by funds from the Governor's office, but ruled that the reimbursement was improper—and thus did not mitigate defendants' liability—because the Legislature had set aside no monies for this expenditure in the appropriation for the Governor's office. It further found that the Governor approved the use of in-kind support, that a substantial but undeterminable part of the expenditures of money, supplies and services was

made for the preparation and promotion of the proposed constitutional amendment and that in the exercise of due care and reasonable diligence none of the payments would have been made, none of the contracts executed, and Geduldig would not have delegated his authority.

Plaintiff's proposed findings of facts included a finding that "a substantial portion of all of the monies, services and supplies . . . were used for the preparation and promotion of the *State Initiative on Taxation.*" (Italics added.) Upon objection by defendants that there was no evidence that any of the monies, services and supplies were used to support the initiative, other than the Governor's transportation costs which were reimbursed from private sources, the trial court rejected the proposed finding. Instead the trial court found that a substantial portion of the monies, services and supplies were used for the "preparation and promotion of the State Constitutional Amendment."

Judgment was entered against Uhler for $94,231, against Geduldig and Hobbs for $18,652.89 and against Geduldig for $8,703.21. Attorney fees of $18,750 were awarded against all three defendants. Judgment was entered in favor of the Governor and the Controller.[5]

## I. *The Uhler Subcontracts.*

As this court said in *Stanson* v. *Mott* (1976) 17 Cal.3d 206, 213 [130 Cal.Rptr. 697, 551 P.2d 1], "[w]e start with the general principle that expenditures by an administrative official are proper only insofar as they are authorized, explicitly or implicitly, by legislative enactment. . . . [S]uch executive officials are not free to spend public funds for any 'public purpose' they may choose, but must utilize appropriate funds in accordance with the legislatively designated purpose." Accordingly, a public official who controls public funds may be held personally liable to repay improperly expended funds if he has failed to exercise due care in permitting the expenditure. (*Id.*, at pp. 226-227.)

Applying this rule, the trial court found Geduldig liable for payments of $8,703.21 from the revolving fund of the Health Care Services Department to consultants and other individuals under the Uhler subcontracts because Geduldig failed to exercise due care in delegating to Uhler his right to contract on behalf of the department. It ordered Geduldig to repay the state treasury "without any credit for reimbursement from funds paid by or received from the Governor's office." It is unclear whether any portion of

---

[5]The Controller rejected the Hobbs contract in May 1973 prior to the filing of the instant action but approved it after the Governor reimbursed the Human Resources Disability Fund.

the judgment against Uhler also rests on these payments, but as we analyze the issue, we find no distinction between the two defendants.

■ Geduldig's delegation to Uhler of authority to contract on behalf of the Health Care Services Department was made pursuant to Government Code section 12854, which provides that "[w]henever a power is granted to the secretary of an agency [or department], the power may be exercised *by such officer or employee within the agency* [or department] as designated in writing by the secretary." (Italics added.) As we have noted, Uhler was neither an officer nor an employee within the Health Care Services Department at the time of the delegation. Moreover, the subject of the delegation was the prior interagency agreement with the Social Welfare Department, which Uhler had signed on behalf of the Health Care Services Department. While state agencies may contract with each other for services, materials and equipment (Gov. Code, §§ 11256, 11257), Uhler was not an agent or employee of the Health Care Services Department at the time he entered into the inter-agency agreement. It is clear that Geduldig and Uhler should have known of Uhler's lack of authority to enter into contracts on behalf of the Health Care Services Department.

But apart from questions of Uhler's status and authority, there is a more fundamental problem with the expenditures under the Uhler subcontracts. The money spent under these contracts came from item 255 of the budget, the administrative appropriation for the Department of Social Welfare. None of the expenditures, however, relate to any subject within the authority of that department. Such expenditures violate the principle that funds must be spent "in accordance with the legislatively designated purpose." (*Stanson* v. *Mott, supra,* 17 Cal.3d 206, 213.)

Defendants point to a variety of statutory provisions to justify these expenditures. Article V, section 4 of the California Constitution provides that "[t]he Governor may require executive officers and agencies and their employees to furnish information relating to their duties." Section 10553, subdivision (c) of the Welfare and Institutions Code requires the director of the Department of Social Welfare to "observe and report to the Governor on the conditions of public social services throughout the state." Section 10612 of that code requires the department annually to make a "full and complete report to the Governor of all its transactions during the preceding year . . . with suggestions and recommendations for legislative and executive action." All of these provisions, however, relate to the duties of the department. They may be given a broad interpretation, authorizing the department to conduct research on issues of social welfare related to its responsibilities, and to report to the Governor on such research. But we cannot read them so broadly that the department may use its funds to conduct

a general review of taxation and spending in California, including taxes and expenditures specifically within the jurisdiction of other departments.

Neither may the use of Department of Social Welfare funds be justified on the theory that the department was merely carrying out its constitutional duty to assist the Governor in the preparation of his budget. (Cal. Const., art. IV, § 12, subd. (b).) This provision contemplates that each department will provide the Governor with the information and estimates necessary for him to determine that department's place in the annual budget; it does not contemplate that one department will finance research into state revenue and expenditures generally upon the possibility that the research may affect the future budget of that and all other departments.

We therefore affirm the trial court's finding that defendant Geduldig acted negligently in authorizing Uhler to enter into the consulting subcontracts on behalf of the Health Care Services Department. On the record, it is also clear that Uhler acted negligently in contracting to use funds provided by the Department of Social Welfare for purposes unrelated to the function of that department. Both Geduldig and Uhler are personally liable for any loss entailed by their actions.

II. *The Hobbs Contract.*

The trial court also found Geduldig and Hobbs liable for the $18,652.59 Hobbs received from the Human Resources Development Department under the December 1 consultant contract. As explained by the Court of Appeal: "There is no doubt that the Unemployment Compensation Disability Fund was an improper funding source for payment under the service contract. Because this fund is in its nature a special trust held for the benefit of unemployed and disabled workers (Unemp. Ins. Code, §§ 2601, 3001), no monies within the fund may be used for a public purpose unrelated to the benefit of these workers. (See *Gillum* v. *Johnson* (1936) 7 Cal.2d 744, 758 [62 P.2d 1037, 108 A.L.R. 595]; see also *Valdes* v. *Cory* (1983) 139 Cal.App.3d 773, 778 [189 Cal.Rptr. 212].) The fact that an administrative appropriation from the special fund (Stats. 1972, ch. 156, item 240, pp. 288-289) was the actual funding source does not make its use permissible for purposes unrelated to the compensation of unemployed and disabled workers. (*Ibid.*) Here, the record clearly establishes that Hobbs, pursuant to the consultant contract, conducted taxing and spending studies which were not limited to the subjects of unemployment and disability insurance.

"There also is substantial evidence to support the trial court's determination that Geduldig authorized or arranged the Hobbs consultant contract

and would not have done so in the exercise of due care. The trial court reasonably could have concluded that a director of the Human Resources Development Department, who was responsible for administering the special fund, would not have approved the expenditures for consultant work which he knew only incidentally involved the study of unemployment and disability insurance."

■ Hobbs' liability, however, rests on a different theory. He is not liable for negligent approval of state expenditures under the doctrine set forth in *Stanson* v. *Mott, supra,* 17 Cal.3d 206, since he was not a state official when he entered into the consulting contract. If, however, a contractor obtains money from the state under an illegal contract, "a right of action exists in the state to recover money paid to a contractor and [the] state is not estopped to deny the validity of such a contract even where it has received the benefit of full performance." (*Pac. Inter-Club Yacht Assn.* v. *Richards* (1961) 192 Cal.App.2d 616, 619-620 [13 Cal.Rptr. 730]; cf. *Bear River etc. Corp.* v. *County of Placer* (1953) 118 Cal.App.2d 684, 690 [258 P.2d 543].) Under this line of authority, the good faith of the contractor is irrelevant; "[o]ne dealing with public officers is charged with the knowledge of, and is bound at his peril to ascertain, the extent of their powers to bind the state for which they seem to act. And, if they exceed their authority, the state is not bound thereby to any extent." (*Mullan* v. *State* (1896) 114 Cal. 578, 587 [46 P. 670]; see also *Air Quality Products, Inc.* v. *State of California* (1979) 96 Cal.App.3d 340, 350-351 [157 Cal.Rptr. 791]; *Bear River etc. Corp.* v. *County of Placer, supra,* 118 Cal.App.2d 684, 690; but see Gov. Code, § 19257 [applicable to state employees].)

III. *The Effect of Reimbursement by the Governor's Office.*

■ Liability of a public official for negligence under *Stanson* v. *Mott, supra,* 17 Cal.3d 206, is based on tort. ■ It is a fundamental principle of tort law "that a negligent act does not give rise to liability without damage." (4 Witkin, Summary of Cal. Law (8th ed. 1974) p. 3135, italics omitted.) ■ At the time this lawsuit was filed, monies spent on the Uhler subcontracts and the Hobbs consulting contract had not been reimbursed; thus the complaint stated a cause of action for negligence. The reimbursement by the Governor's office, however, eliminated all damages attributable to the negligence of defendants.

Plaintiff, however, argues, and the trial court found, that the funds appropriated for the Governor's office could not properly be used to reimburse the expenditures in question. An improper reimbursement, presumably, would not eliminate the damages caused by the unauthorized expenditures.

We first reject the suggestion that the task force funds were used for nongovernmental purposes which could not properly be financed by state revenues. The trial court rejected a proposed finding that task force activities encompassed promotion of an initiative measure, and found instead that its activities involved preparation and promotion of a constitutional amendment before the Legislature. ■ The drafting of a constitutional amendment on behalf of the Governor, and lobbying on its behalf with the Legislature, is a permissible use of public funds. (See Stanson v. Mott, supra, 17 Cal.3d 206, 218.)

■ The particular contracts here at issue concerned a comprehensive study of taxing and spending programs. ■ Unquestionably such a study is a proper function of the Governor and his office. His authority to prepare and submit a proposed budget, and to recommend legislation, necessarily includes the power to engage in studies of the financial structure of state government. (See Bateman v. Colgan (1896) 111 Cal. 580, 587-588 [44 P. 238].) We conclude that the Governor had the power both to establish the task force, and to finance it from the appropriation for his office. ■ It necessarily follows, we believe, that when the Governor became aware that the task force had been financed from improper sources, depleting funds appropriated for other purposes, he had the power to correct the error and reimburse the injured departments from the budget of his office.

In sum, since the Department of Health Care Services and the Social Welfare Department sustained no permanent loss as a result of the negligence of Geduldig or Uhler, the judgment against those defendants should be reversed. Although Hobbs's liability rests on a theory of strict liability instead of negligence, we reach the same result as to him, finding that the reimbursement of the agencies exonerates his liability. The cases establishing the duty of a contractor to repay monies obtained under an illegal contract even though he has performed the services called for impose an onerous burden. When the only illegality is the source of the funds, and the state has subsequently corrected its error and transfered funds from a proper source, we see no reason to require a repayment that would unjustly enrich the state treasury and leave the contractor without compensation for services rendered.

IV. *In-kind Contributions and Services.*

■ The trial court found Uhler liable in the amount of $94,231 for the value of in-kind contributions and services received by the task force from various agencies and departments. The Governor's office has not reimbursed the cost of in-kind contributions and services.

We agree, however, with the Court of Appeal that the evidence is insufficient to hold defendant Uhler liable for the value of the in-kind services. In the first place, the evidence of the nature and value of the services is inadequate. There is no evidence identifying either the specific nature of the support given by various agencies and departments or the funding source for such support. In fact, the only evidence on the subject is a note by Uhler himself giving rough estimates of the in-kind contributions and personnel provided the task force.[6] Uhler was not able to testify specifically what in-kind services he received from each agency or department.

Secondly, it is not at all clear to what extent the services contributed by employees went beyond the employee's duties on behalf of the departments where they were employed. The trial court's finding, holding Uhler liable for the full value of the services, was based on the theory that the task force was an improper governmental activity, and that no public funds or employee time could properly be devoted to that activity. We have concluded, however, that the task force study was a legitimate governmental activity which could have properly been financed from the budget for the Governor's office. Also, to the extent that public employees were asked to provide the Governor with information relating to their duties, that use of their time was authorized by article V, section 4 of the state Constitution.

Finally, we believe that the efficient use of state personnel requires a flexible attitude toward the borrowing of employees. On occasion one state agency may temporarily need the expert skills and knowledge of an employee who works for another agency; on other occasions one agency may be shorthanded while another is unable to utilize its personnel fully. The temporary borrowing of employees under such circumstances should not expose the supervising official to personal liability as long as the borrowed employee is used for a proper state purpose.

This flexibility has its limits, for extensive and long-term borrowing of employees could become a device to circumvent the direction of the Legislature, which has appropriated fixed amounts for the budget of each agency. The evidence does not show that such limits were exceeded in this case.

V. *Attorney Fees.*

Plaintiff seeks attorney fees under Code of Civil Procedure section 1021.5, which authorizes such an award to a successful party in an action

---

[6]The approximated contributions included $750 in money, $2,444 in kind, and $16,975 in personnel from the Business and Transportation Agency (Department of Housing and Community Development); $5,400 in kind and $65,522 in personnel from the Health and Welfare Agency (Department of Social Welfare and Human Resources Development); and $3,140 in personnel from the Department of Finance.

which has resulted in the enforcement of an important right affecting the public interest, if the award confers a significant benefit on the general public or a large class of persons. Plaintiff has not prevailed in this litigation, but it is possible that he might be entitled to fees on the theory that the filing of his suit caused the Governor's office to reimburse monies improperly taken from the Department of Social Welfare and the Unemployment Compensation Disability Fund. Upon remand the trial court may determine whether plaintiff is entitled to attorney fees under section 1021.5, and the amount thereof. (See *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 925-926 [154 Cal.Rptr. 503, 593 P.2d 200].)

The judgment is reversed.

Mosk, J., Reynoso, J., and Grodin, J., concurred.

**BIRD, C. J.,** Concurring.—The Hobbs and Uhler contracts, which purchased consultant services for the tax reduction task force, were legitimate uses of public funds under *Stanson* v. *Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1]. (See maj. opn., *ante,* at pp. 36-37.) The task force's function was to develop new legislative proposals and to lobby for these proposals before the Legislature. As this court has acknowledged, such work is "one of the primary functions of elected and appointed executive officials []." (*Stanson, supra,* 17 Cal.3d at p. 218.)

There is no evidence that any public funds were used in the electoral campaign for the tax reduction initiative, a use which would have been illegal under *Stanson, supra,* 17 Cal.3d at page 218.

The Governor's office appropriation would have been an entirely suitable funding source for the task force's work.[1] One of the most important duties of a Governor is "to devise legislative proposals to attempt to implement the current administration's policies." (*Stanson, supra,* 17 Cal.3d at p. 218.) It was contemplated by the Legislature that an appropriation such as item 20 would be used to pay staff and consultants to carry out this function.

The respective departments from which the Hobbs and Uhler contracts were *actually* funded were made whole when the Governor's office reimbursed them from the item 20 appropriation. Since the state is not entitled to double recovery, the individual defendants should not be held liable for the amounts spent under these contracts.

---

[1] Item 20 of the Budget Act of 1972 (Stats. 1972, ch. 156, hereafter Budget Act) appropriated nearly $1.7 million "for support of Governor and of Governor's office."

However, it makes no difference that the departments were later made whole, as to whether there was an impropriety here. The sources from which these contracts were actually funded were *not* proper ones. The funds were drawn from budget items appropriated for other, unrelated purposes. And, the public officials who decided to spend funds from these budget items on task force activity violated the duty of care set forth in *Stanson:* "[P]ublic officials must use 'due care,' i.e., reasonable diligence, in authorizing the expenditure of public funds, and may be subject to personal liability for improper expenditures made in the absence of such due care. [Fn. omitted.]" (*Stanson, supra,* 17 Cal.3d at pp. 226-227.)

Also, here, as in any action seeking damages caused by a defendant's violation of a duty of care, recovery from one tortfeasor before or after judgment merely reduces pro tanto the amount for which the remaining defendants are liable. (*Laurenzi* v. *Vranizan* (1945) 25 Cal.2d 806, 813 [155 P.2d 633].) It does not eliminate the cause of action against them.

It is important that the court—and the defendants—not lose sight of the initial wrongdoing simply because the misused funds were later restored. The record here shows that several highly placed government officials took funds which the Legislature had appropriated for particular purposes and used them for activities entirely unrelated to those programs. The complete disregard for the Budget Act which these officials of the executive branch exhibited should not be condoned.

## I.

The facts are instructive. In the fall of 1972, former Governor Ronald Reagan and his cabinet decided that in order to utilize the balance of his term most effectively three task forces would be formed to develop new policies and specific proposals. The task forces would address the areas of tax reform, criminal justice, and local government relations. Lewis Uhler, then assistant secretary of the Human Relations Agency, was appointed chairperson of the tax reduction task force.

The tax reduction task force (hereafter task force) was formed because "the Governor and the Cabinet were concerned about the seemingly inexorable growth in taxes and spending at the State and local government level and . . . wanted . . . a Task Force to investigate all aspects of taxes and spending, education, finance, unemployment compensation, funding and expenditures and a wide range of tax issues."

The task force was given a charge to "review the entire tax and public financing system in our State and recommend a plan for reducing the tax

burden carried by our citizens." Specifically, the task force was directed to explore the feasibility of imposing a ceiling on government revenues, reducing government programs, legislating tax refunds, and redistributing the burden of taxation among the various types of tax, e.g., income, wealth, and consumption. It was also instructed to examine public education financing, bonding programs and state indebtedness, and other aspects of taxation which it deemed significant.

The task force had no budget of its own, but it was supported from several sources. The General Services Department made available unused office space and equipment. Apparently, defendant Uhler's salary was paid from item 20, the Governor's office budget.[2] Defendant Hobbs left state service to work for the task force as a private consultant. Pursuant to a contract signed by defendant Geduldig, who became Director of the Human Resources Department (HRD) in December 1972, Hobbs's consultant fee was paid from the administrative budget of the Unemployment Compensation Disability Fund (item 240 of the Budget Act). Numerous state employees provided services on a "release time"[3] basis. Several outside economists performed studies. If they were paid, it was with funds provided by a private foundation. Finally, $30,000 was obtained from the operating expense appropriation for the Department of Social Welfare (DSW, or the department), item 255 of the Budget Act.

The item 255 funds were made available to the task force through a contract between Uhler, as chairman of the task force, and the chief deputy director of DSW. The contract recited that the money would be used to pay consultants for "analysis of the tax impact of welfare spending, including the availability and appropriateness of tax resources for welfare related programs." The payments to the task force's consultants were to be made initially from the Department of Health Care Services' (DHCS) revolving fund, since it was felt that department was better able to provide the necessary processing and accounting services. Geduldig (who was director of DHCS in the fall of 1972) signed a separate contract which authorized Uhler to commit DHCS funds to task force purposes. By interagency agreement, the DHCS revolving fund was to be reimbursed from DSW's item 255 appropriation.

Notwithstanding the first contract's recital that the item 255 funds were to be used for welfare-related studies, it appears that no such limitation was intended or observed in practice. Uhler testified that "the objective of the

---

[2]Uhler testified he was not certain who paid his salary or the salaries of the other task force personnel.

[3]These employees remained on the payrolls of their respective agencies, even though some if not all of their time was devoted to task force work.

funding here was to provide a modest degree of flexibility to the Task Force, out of the administrative funds of this department [DSW], under the direction and discretion of the Director of the Department, to assist with consultant fees, expenses of a miscellaneous nature, beyond those contributed pro bono publico and beyond the release time services of existing state employees.''

Some part of the task force's overall work "included [analysis of the] impact on welfare recipients of both taxing and spending practices of State and local units of government." However, Uhler could not recall any contract for research on this topic which was funded from the item 255 monies. The item 255 funds were used to finance consultant contracts (1) "to develop a practical method for financing public schools in light of current court decisions"; (2) "to develop plans for an implementing organization and for the method of analysis of the impact of the tax limitation proposal"; (3) to "provide economic analysis of the impact of tax and spending programs"; and (4) to "develop programs to analyze and present tax and expenditure data for the [task force]." The item 255 money also paid for typing pool services, data analysis, two graphic artists and a full-time secretary.

## II.

"Money may be drawn from the Treasury only through an appropriation made by law . . . ." (Cal. Const., art. XVI, § 7, formerly Cal. Const., art. XIII, § 21.) "[A] warrant shall not be drawn unless authorized by law, and unless . . . unexhausted specific appropriations provided by law are available to meet it." (Gov. Code, § 12440.)

These provisions embody a fundamental and time-honored principle of representative government. Their "object is to secure to the legislative department of the government the exclusive power of deciding how, when, and for what purposes the public funds shall be applied in carrying on the government. . . . [These provisions] had [their] origin in Parliament in the seventeenth century, when the people of Great Britain, to provide against the abuse by the king and his officers of the discretionary money power with which they were vested, demanded that the public funds should not be drawn from the treasury except in accordance with express appropriations therefor made by Parliament . . .; and the system worked so well in correcting the abuses complained of, our forefathers adopted it, and the restraint imposed by it has become a part of the fundamental law of nearly every state in the Union. To the legislative department of the government is intrusted the power to say to what purpose the public funds shall be devoted

in each fiscal year . . . ." (*Humbert* v. *Dunn* (1890) 84 Cal. 57, 59-60 [24 P. 111]; see also *People* v. *Pacheco* (1865) 27 Cal. 175, 209.)

The constitutional and statutory scheme ensures that decisions about the allocation of public funds will be made through the legislative appropriation process. Accordingly, "[t]he general requisite of an appropriation is certainty of purpose, of amount, and of the treasury fund which is to stand the expenditure. [Citation.]" (22 Ops.Cal.Atty.Gen. 243, 244-245 (1954).) The requirement of a "specific appropriation" (Gov. Code, § 12440, *supra*) reflects this need for "certainty of purpose." "By a specific appropriation we understand an Act by which a named sum of money has been set apart in the treasury and devoted to the payment of a particular claim or demand." (*Stratton* v. *Green* (1872) 45 Cal. 149, 151.)

Thus, appropriation bills other than the budget bill are limited to "one item of appropriation, and that for one certain, expressed purpose." (Cal. Const., art. IV, § 12, formerly Cal. Const., art. XIII, § 20.) The same certainty of legislative purpose is assured in the budget bill through the constitutional requirement that the budget be "itemized" (*ibid.*), and through the statutory requirement that it "contain a complete plan and itemized statement of all proposed expenditures of the state . . . and all of its institutions, departments, boards, bureaus, commissions, officers, employees and other agencies . . . ." (Gov. Code, § 12016; see present Gov. Code, §§ 13320, 13337, subd. (a).)

It is essential to this constitutional and statutory scheme that public officials be bound by legislative "certainty of purpose." (22 Ops.Cal.Atty.Gen., *supra,* at pp. 244-245.) As this court recently held, "[w]e start with the general principle that expenditures by an administrative official are proper only insofar as they are authorized, explicitly or implicitly, by legislative enactment. . . . [S]uch executive officials are not free to spend public funds for any 'public purpose' they may choose, but must utilize appropriated funds in accordance with the legislatively designated purpose. 'It is the policy of the law in the absence of a clearly negatived intention to have . . . funds authorized for a particular purpose expended for such purpose.' [Citations.]" (*Stanson, supra,* 17 Cal.3d at p. 213.)

This principle was completely disregarded when the Uhler contracts were signed. Those contracts authorized the expenditure of funds from DSW's operating budget for consultants to study subjects entirely unrelated to social welfare programs. No evidence in the record suggests that any of these subjects fell within DSW's jurisdiction. Appellants can point to no statutory provision which indicates a legislative intent that DSW perform any duties connected with taxation and spending except as related to those social welfare

programs which the department administers. Certainly, DSW has no statutory authority to involve itself in school finance, tax structures, or any of the other areas for which the item 255 funds were spent under these contracts.

Section 10553 of the Welfare and Institutions Code directs the director of DSW to "observe and report to the Governor on the conditions of public social services throughout the state" and to "[f]ormulate, adopt, amend or repeal regulations and general policies affecting the purposes, responsibilities, and jurisdiction of the department and which are consistent with law and necessary for the administration of public social services."[4]

Section 10602 of that code requires the department to "investigate, examine and make reports upon . . . [t]he charitable institutions of the state and . . . [t]he public officers who are in any way responsible for the administration of public funds used for public social services . . . ." Finally, Welfare and Institutions Code section 10612 requires the department annually to make a "full and complete report to the Governor of all its transactions during the preceding year, showing specifically all expenses incurred and moneys paid out by it, with suggestions and recommendations for legislative and executive action." While these provisions would authorize DSW to engage in a broad range of research projects concerning social welfare, they can scarcely be construed to authorize a study of educational financing.

Similarly, article V, section 4 of the California Constitution, which provides that "[t]he Governor may require executive officers and agencies and their employees to furnish information relating to their duties," does not authorize DSW to use its funds to gather information which is *not* related to its duties.

Appellants argue, quite correctly, that the courts may not demand an unreasonable degree of specificity in appropriations bills, because neither the Legislature nor the agency can be expected to foresee every item of expenditure. Nor may the courts hold public officials to an unreasonably literal reading of legislative appropriations. When an agency is charged in general terms with performance of duties, and funds are provided for that performance, "'the department is clothed with a discretion in the exercise of which it is to determine the necessity for the expenditure of the funds involved.'" (19 Ops.Cal.Atty.Gen. 42, 43 (1952).)

---

[4]These code provisions are unchanged since 1972, even though the department which implements them is now designated the Department of Social Services rather than the Department of Social Welfare. (See Welf. & Inst. Code, §§ 10054, 10055, 10550, 10553.)

Appellants further contend that this discretion is so broad that a department is not bound by a rule of strict necessity in its exercise. As Deputy Attorney General (later Court of Appeal Justice) Friedman concluded in his opinion, "[d]iscretion is abused when the action exceeds the bounds of reason. [Citation.] . . . Action is reasonable when it is suitable in the circumstances, when it is legitimate in view of the end attained. [Citation.]" (21 Ops.Cal.Atty.Gen. 181, 182 (1953).)

While these principles are valid, they are of no assistance in this case. The expenditures here "exceed[ed] the bounds of reason" not because they failed to meet a test of absolute necessity, but because they bore *no* relation to performance of any duty with which the department was charged.

The task force's efforts to justify the use of DSW's operating expense appropriation are not persuasive. In a memo written after the commencement of this law suit, the task force suggested that a reformed educational financing system would ultimately reduce the number of people on welfare by improving education. It claimed that its analysis of the "incentives and motivations of government employees" would improve their performance and that improved performance by government-employed social workers would result in fewer people on welfare. Additionally, it noted that even welfare recipients pay certain taxes which might be reduced as a result of the task force's work.

These strained efforts after the fact to bring the task force's work within the scope of DSW's operations are unavailing. At most, they show that the task force's efforts might incidentally benefit welfare recipients, as part of the general population. To accept this justification for the expenditure of DSW funds would be to write out the requirement of specificity.

Nor may the task force's use of departmental funds be justified on the theory that its work was "budgetary." I agree that all departments are required to assist the Governor in budget preparation and to make available whatever personnel and resources are needed for this job. (Cal. Const., art. IV, § 12, subd. (b); see also Gov. Code, §§ 13320, 13337.) However, this duty requires assistance only within the scope of the department's (or official's) legally mandated activities. Article IV, section 12 cannot justify the use of departmental funds or personnel for activities entirely outside the scope of the present budget based on some theory that these activities may affect some future budget.

The Uhler contracts were not justified simply because an operating expenses appropriation may be used to purchase outside services under section 26, subdivision (b) of the Budget Act. The objection to these contracts is

not that they were for outside services, but rather that the *purpose* of the outside services had nothing to do with DSW's mandate. Authorization for a department to purchase outside services cannot be construed as a blanket authorization to purchase such services for any "public purpose." (*Stanson, supra,* 17 Cal.3d at p. 213.)

Uhler's expenditure of item 255 funds for task force purposes cannot be justified under *Mandel* v. *Myers* (1981) 29 Cal.3d 531 [174 Cal.Rptr. 841, 629 P.2d 935]. In that case, this court found that an analogous budget item could be used to pay court-awarded attorney fees arising from litigation against the department. Such fees could be charged against a departmental operating expense appropriation because the award of those fees "rested in large part upon the fact that plaintiff's attorneys had provided a substantial economic benefit to the department . . . ." (*Id.,* at p. 543.) The court noted that it had been the practice of several state agencies to charge attorney fee awards against their general operating budgets. (*Id.,* at p. 544.)

However, nothing in *Mandel* suggests that the Legislature intended that a department's operating budget could be used to pay for activities wholly outside that department's jurisdiction.

There are other distinctions. *Mandel*'s holding rested in part on serious constitutional considerations absent here. In *Mandel,* there was no specific appropriation to pay attorney fees. Yet, the attorney fees had been awarded by a court, which had entered a judgment for the amount it found proper. Had this court not found in *Mandel* that the fees could be charged against the department's operating expense appropriation, it would have had to decide whether the omission of a specific appropriation for this purpose amounted to a "legislative usurpation of traditional judicial authority." (*Mandel, supra,* 29 Cal.3d at p. 547.)

This court noted that "[o]ur Constitution assigns the resolution of such specific controversies to the judicial branch of government (Cal. Const., art. VI, § 1) and provides the Legislature with no authority to set itself above the judiciary by discarding the outcome or readjudicating the merits of particular judicial proceedings . . . . [¶] The recognition of such legislative authority would completely deprive court judgments of the respect and deference which the Constitution contemplates each branch of government will accord to final actions within the jurisdiction of a coequal branch, and would repose in the Legislature a combination of powers that the constitutional draftsmen specifically intended to forestall. [Fn. omitted.]" (*Id.,* at pp. 547, 549.)

Here, the conflict is between the legislative and the executive branches. This case presents no suggestion of a legislative usurpation of executive

powers. The Governor was free to carry out all the task force activities through the use of his own discretionary budget and the proper use of state personnel under article V, section 4. His discretionary budget is free of any fiscal supervision from the Legislature or from other constitutional officers.[5] Therefore, the Governor's "primary function [] . . . to devise legislative proposals to attempt to implement the current administration's policies" (*Stanson, supra,* 17 Cal.3d at p. 218) is adequately protected from legislative curtailment. Under these circumstances, the doctrine of separation of powers dictates that the executive branch should have a healthy respect for legislative intent when expending public funds.

None of the justifications offered by the defendants for the expenditure of DSW funds on task force activities is valid. On the contrary, the expenditure of these funds was improper.

### III.

Next, I turn to the propriety of using the administrative budget of the Unemployment Compensation Disability Fund to fund the Hobbs contract. The impropriety of this contract should have been clear to all participants.

The Unemployment Compensation Disability Fund is a special trust held for disabled, unemployed workers. (Unemp. Ins. Code, §§ 2601, 3001-3012.) It is funded by worker contributions and federal monies. (*Id.,* §§ 984, 985, 3004.) These contributions "constitute an insurance-type trust fund which . . . create[s] a reserve which will fund payments of benefits to workers during adverse economic conditions." (64 Ops.Cal.Atty.Gen. 482, 492 (1981).)[6]

Accordingly, all money in the fund is continuously appropriated for the *sole* purpose of paying disability benefits and the administrative expenses

---

[5]Item 20 provides that the Governor's office appropriation shall be "exempt from the provisions of Sections 925.6, 12410, and 13320 of the Government Code." These sections would otherwise require that the Controller audit all expenditures drawn against the appropriation and that a detailed budget for these expenditures be prepared in advance.

[6]The Unemployment Compensation Disability Fund is one of the "component elements of a general, coordinated plan of social insurance developed by the Legislature." (*California Comp. Ins. Co.* v. *Ind. Acc. Com.* (1954) 128 Cal.App.2d 797, 806 [276 P.2d 148].) It was created in 1946 (Stats. 1947, First Ex. Sess. 1946, ch. 81, p. 101), 11 years after the enactment of the original State Unemployment Reserve Act. (Stats. 1935, ch. 352, p. 1226.) The fund was designed to provide benefits for the loss of wages by an employee whose disability disqualifies him or her from receiving unemployment insurance (see Unemp. Ins. Code, § 1253, subd. (c)) but does not establish an entitlement to benefits under the Workers' Compensation Act (see Lab. Code, § 3600, subd. (a)(2)). (*Garcia* v. *Industrial Accident Com.* (1953) 41 Cal.2d 689, 692 [263 P.2d 8]; 64 Ops.Cal.Atty.Gen., *supra,* at pp. 486-490.)

of the program. (Unemp. Ins. Code, § 3012, subd. (a).)[7] As is the case with the Unemployment Fund (see *id.*, § 1521), "moneys so contributed [to the fund] are not public moneys in the sense that they are subject to appropriation other than as provided in the act. The funds thus raised are in their nature a continuing appropriation for a specific purpose. (See *Daugherty* v. *Riley* [(1934)] 1 Cal.2d 298[, 308].) The balances therein do not revert to the general fund at the end of the fiscal year and under both the state and federal acts constitute trust funds . . . ." (*Gillum* v. *Johnson* (1936) 7 Cal.2d 744, 758 [62 P.2d 1037, 108 A.L.R. 595].) Consequently, *none* of the money in the fund may be appropriated for a general public purpose unrelated to the disbursement of benefit payments to unemployed and disabled workers. (Cf. *Valdes* v. *Cory* (1983) 139 Cal.App.3d 773, 782-783 [189 Cal.Rptr. 212].)

As authorized by Unemployment Insurance Code section 3012, *supra,* the Legislature appropriated a portion of the fund to pay the administrative expenses for processing payments. (Budget Act, item 240.) Like any other expenditure from the fund, this appropriation is only for the "specific purpose" (*Gillum* v. *Johnson, supra,* 7 Cal.2d at p. 758) for which the fund exists. It is *not* available for any other purpose.

Hobbs's contract work was not even remotely related to the administration of the disability benefits program. The record shows clearly that the intent of the parties in entering that contract was to do work for the task force. It had nothing to do with the administration of the disability program. At the time Hobbs signed the contract, he was already working for the task force as a salaried assistant to the Governor. He testified that his reason for entering into the contract was to continue his task force work as a private consultant rather than as a state employee. Michael Deaver of the Governor's office suggested the Unemployment Insurance Disability Fund to Hobbs as a source of payment.

Hobbs spoke to Geduldig, who by December of 1972 had left DHCS to assume the directorship of HRD, the agency responsible for administering the fund. Hobbs explained that he would be working on all types of taxation, including unemployment disability funding. Geduldig approved the contract to pay Hobbs. The contract recited that Hobbs was to "act as a Special Consultant to the Governor's Office for tax and spending programs."

---

[7]This subdivision provides that "all money in the disability fund is continuously appropriated . . . for the purpose of providing disability benefits pursuant to this part, including the payment of refunds, credits, or judgments, and interest thereon, the payment of disability benefits to all eligible persons not covered exclusively by an approved voluntary plan, and the payment of the expenses of administration of this part . . . ."

Hobbs's actual activities under the contract did not involve the administration of the disability fund. Hobbs testified that he researched the area of taxation. In January and February of 1973,[8] he spent most of his time preparing the constitutional amendment. Thereafter, he testified about it at legislative hearings and researched some points (none of which involved unemployment disability funding) at the request of the Senate Finance Committee.

When it appeared that the Legislature was not interested in the constitutional amendment, Hobbs turned his attention to other areas—educational finance, state bonding practices, job programs, unemployment insurance, and disability insurance. After May 1st, he worked primarily on the subjects of school finance and unemployment disability insurance.

The fact that one small portion of Hobbs's research during the last two months of the seven-month contract concerned the disability insurance program is insufficient to bring his contract within the limitations of item 240. Nothing in the record gives the slightest indication that Hobbs's research was directed toward the administration of the program. Nothing indicates that his assignment extended beyond the design of a comprehensive tax reduction scheme for the Governor.

I do not suggest that it would have been improper for HRD to use funds from item 240 to "furnish information relating to [its] duties" (Cal. Const., art. V, § 4). Nor would any impropriety arise if the Governor requested this information in connection with the task force's work. The Constitution does not so circumscribe the Governor when he or she seeks information. Nor would it have been improper for the department to hire outside consultants to assist in discharging this constitutional function.

However, nothing in the record suggests that the Hobbs contract was intended to or did furnish information to the Governor about the administration of the Unemployment Insurance Disability Fund. On the contrary, the record demonstrates that Hobbs, Geduldig and Deaver simply saw item 240 as an expedient method for funding a project for the Governor. The fact that the bulk of work of the project had nothing to do with the fund was a mere inconvenience. A few vague references to research about disability insurance to overcome the constitutional impropriety cannot change this conclusion.

## IV.

I am aware that the Governor's office reimbursed the agencies affected by the unauthorized expenditures and that no permanent losses were suf-

---

[8]The contract period was from December 1, 1972, through June 30, 1973.

fered. I agree that to exact damages from the defendants in this case would give the state a double recovery. I do not urge such a result.

Additionally, it would be unfair to fix sole responsibility for the improper expenditures on defendant Geduldig. He evidently played no role in the decision to misappropriate item 255 funds to the task force. He signed the contract giving Uhler authority to spend funds from the DHCS revolving fund on the understanding that this was merely a funding arrangement and that DHCS would be fully reimbursed from the item 255 funds. Furthermore, in signing the Hobbs contract, Geduldig was apparently acting under instructions from the Governor's office. If the decisions that led to the misappropriation of state funds from items 240 and 255 were indeed made by others, Geduldig should not be found to have breached a duty of due care.[9]

The fact that the damages were later repaid does not mean that there was no violation of the duty of due care on the part of those who engineered a scheme by which funds were misappropriated. Nor does this fact mean that no cause of action was stated. A cause of action is lacking where a plaintiff has suffered no harm as a result of negligence. (*Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433]; *Kirtland & Packard* v. *Superior Court* (1976) 59 Cal.App.3d 140, 144 [131 Cal.Rptr. 418].) However, reimbursement—before or after judgment—from one alleged tortfeasor does not vitiate a cause of action. It simply reduces *pro tanto* the amount for which the remaining defendants are liable. (*Laurenzi* v. *Vranizan, supra,* 25 Cal.2d at p. 813; *Krusi* v. *Bear, Stearns & Co.* (1983) 144 Cal.App.3d 664, 673 [192 Cal.Rptr. 793].)

Here, the state did suffer a loss when the improper expenditures were made in 1972 and 1973. The loss remained uncompensated at the time the

[9]The trial court also held Geduldig liable for the Uhler contracts on the procedural ground that he improperly delegated to Uhler discretionary authority to spend DHCS funds. Geduldig, on behalf of DHCS, signed a contract which purported to delegate to Uhler authority to draw on the DHCS revolving fund for task force work up to the amount of $30,000. Since the power to spend these public funds is clearly one of the "powers conferred upon public agencies and officers which involve the exercise of judgment or discretion . . ." (*California Sch. Employees Assn.* v. *Personnel Commission* (1970) 3 Cal.3d 139, 144 [89 Cal.Rptr. 620, 474 P.2d 436]), it cannot be delegated except by statutory authorization. (*Ibid.*) Government Code section 12854 would authorize delegation to an "officer or employee within the agency." Uhler was neither.

Under the circumstances, this improper delegation should not be an independent basis for Geduldig's liability. Uhler was in reality being given discretionary authority to spend DSW, not DHCS, funds. This decision was made by others several months before Geduldig was brought into the scheme.

Furthermore, the "procedural" violation is not really independent of the "substantive" one. Had the expenditure of item 255 funds been for a proper purpose, there would not have been any violation of Government Code section 12854 for the DSW director to contract with an outside consultant and to allow that consultant the discretion to decide how much of his work to subcontract. Here, the delegation was improper because the *purpose* for which the funds were committed to Uhler's discretion was improper.

complaint was filed in September of 1973.[10] Therefore, a valid cause of action was filed.

## V.

If DSW funds were not available for task force purposes, the department's services and personnel could not be so used. However, the record before this court does not permit affirmance of the entire judgment of $94,231 against Uhler for ordering the use of these services and personnel for the task force.

It is clear that Uhler may be held responsible for the decisions which led to the release of these employees. He identified those employees whose services the task force wanted. He had the power to require department and agency heads to make employees available. In this respect, the trial court's finding that Uhler should be held liable for the value of their services is supported by substantial evidence.

However, the record is inadequate to enable this court to affirm the full amount of the judgment against Uhler or to determine how much of the judgment should be affirmed. The trial court held Uhler liable for the full cost of the release time given the task force. The theory advanced was that the task force was an improper governmental activity. Therefore, the trial court concluded that *no* public funds or public employee time could properly have been used. This conclusion was erroneous. The Governor's discretionary budget could properly have been spent on the task force's work.

Furthermore, some of the release time may have been proper even if the employees remained on their respective agencies' payrolls. To the extent those employees were asked to provide the Governor's office with information relating to their duties, the use of their time was authorized by article V, section 4 of the state Constitution.

Since the trial court was proceeding on the erroneous premise that the task force's entire operation was an improper use of any public funds, it failed to break down the release time into that which was proper under article V, section 4 and that which was not. The record before this court consists solely of a list of agencies which furnished release time employees and services, and the total value of the services rendered. The trial court erred in failing to inquire as to what portion of these services should have

---

[10]The Governor's office reimbursed the departments a few days *after* the complaint was filed.

been reimbursed, either by the Governor's office discretionary fund or by defendants.

Respondent's petition for a rehearing was denied August 20, 1986, and on July 30, 1986, the opinion was modified to read as printed above.