[No. B029791. Second Dist., Div. One. Aug. 3, 1988.]

LEAGUE OF WOMEN VOTERS OF CALIFORNIA et al.,
Plaintiffs and Appellants, v.
COUNTYWIDE CRIMINAL JUSTICE COORDINATION
COMMITTEE et al., Defendants and Respondents.

530

**COUNSEL**

Overland, Berke, Wesley, Gits, Randolph & Levanas, Mark E. Overland and Robert Berke, for Plaintiffs and Appellants.

De Witt W. Clinton, County Counsel, and David L. Muir, Deputy County Counsel, for Defendants and Respondents.

OPINION

**SPENCER, P. J.—**

### INTRODUCTION

Plaintiffs League of Women Voters of California, Gerald Uelman and Richard Floyd appeal from a summary judgment granted in favor of defendants.

### PROCEDURAL BACKGROUND

The parties submitted their respective motions for summary adjudication primarily on stipulated facts and exhibits, although defendants submitted some additional evidence in the form of declarations. The trial court denied plaintiffs' motion in its entirety and granted defendants' motion as it related to six issues alleged to pose no triable issues of material fact; the trial court determined there were no triable questions of material fact, adjudged these issues to be without substantial controversy and deemed them established. As to two other issues, the trial court denied defendants' motion.

Thereafter, the parties stipulated the court's ruling of December 1, 1986, and its order of December 11, 1986, specifying certain issues without substantial controversy should be entered as a final judgment in the matter. They further stipulated there was no triable issue of material fact as to the specific provisions contained in a proposed judgment and, as to those issues the court had designated as questions of material fact, no additional evidence would be presented unless the judgment was reversed in part or in whole on appeal. In accordance with this stipulation, the trial court entered judgment on July 29, 1987.

### STATEMENT OF FACTS

On March 7, 1981, the Los Angeles County Board of Supervisors established the Countywide Criminal Justice Coordination Committee (CCJCC). CCJCC was comprised of the chairman of the board of supervisors, acting as ex officio committee chairman; the Los Angeles County sheriff, district attorney, public defender, chief administrative officer, director of community development, superintendent of schools, director of data processing and clerk; the mayor, city attorney, chief administrative officer, president of the city council and Chief of Police of the City of Los Angeles; the presiding judge and supervising judges of the criminal and juvenile divisions of the Los Angeles County Superior Court; the chairmen of the Municipal Courts

Judges Association and the Municipal Court Presiding Judges Association; the Superintendent of the Los Angeles Unified School District and four representatives of smaller cities or police departments in the county. In February 1983, the United States attorney for the central district was added as a member.

A standing legislative subcommittee was formed as part of CCJCC, with Assistant Sheriff Robert A. Edmonds serving as chairman. Other members included representatives from the county's chief administrative officer, the probation department, the district attorney and the county counsel. Mr. Edmonds was compensated as assistant sheriff while he performed his subcommittee duties.

In September 1982, CCJCC directed the legislative subcommittee to study a proposal to implement certain procedural changes in the criminal justice system. The subcommittee was instructed to explore the initiative process as a means of obtaining these reforms. On September 29, the legislative subcommittee met during business hours. The subcommittee discussed a proposal to reduce state constitutional requirements for juries in criminal cases. It reached the conclusion an amendment should be pursued to reduce the size of juries in misdemeanor cases to six jurors and to reduce the number of votes required for misdemeanor convictions or acquittals to five, as well as to reduce the requirements for conviction or acquittal in all felony cases except capital crimes to ten votes rather than twelve.

As noted in the report of the September 29, 1982, meeting, "The subcommittee agreed in concept with the suggestion to seek the necessary constitutional amendments through the initiative process. However, the subcommittee also identified a number of practical issues which will clearly limit the CCJCC's involvement in such a campaign. [¶] —No public funds can be used to advocate a position on any matter placed before the electorate. [¶] —A Statewide initiative campaign calls for a massive organizational and financial effort based on widespread public interest and concern. [¶] An initiative process is extremely costly with estimates for the petition process alone running at over half a million dollars." The report concludes with the following recommendations: "—that the CCJCC adopt a position favoring reduced juries; but assume *no direct role* in organizing or coordinating a ballot initiative campaign. [¶] —that the CCJCC explore public sentiment on this issue and take steps to identify statewide organizations willing and able to spearhead an initiative process. [¶] —that the CCJCC provide assistance to such organizations as appropriate and/or legally proper." (Italics in original.)

In November 1982, the legislative subcommittee requested attorneys employed by the appellate division of the office of the district attorney, in the course of performing their duties, to research and draft a memorandum on possible proposals to be included in a draft proposed initiative. These attorneys utilized county resources and overhead, including secretarial services, and produced an eight-page document which covered twenty-seven distinct proposals to effectuate wide-ranging changes in both misdemeanor and felony criminal procedure. The memorandum, dated November 22, 1982, is prefaced with the following statement: "We wish to emphasize that these are proposals only, followed by a few brief comments. Listing these proposals here should not be considered an endorsement of their merits."

The legislative subcommittee held many meetings between November 1982 and March 1983 to develop ideas for and to draft a proposed initiative to present to the CCJCC, with the expectation the proposed draft eventually would be submitted to the Secretary of State for qualification as a ballot measure. The subcommittee developed a proposed timetable to be presented to the CCJCC for its approval, which covered the gathering of subjects for inclusion in a draft proposed initiative, the drafting of its language and contacting interested groups who might serve as sponsors of such an initiative. By February 1983, the subcommittee had narrowed an initial list of 27 proposals to 7 which would be included in the draft proposed initiative. On each occasion, the subcommittee met during business hours in county facilities.

Deputy district attorneys and other county employees used county supplies and support services in formulating, drafting and typing memoranda on the various proposals in lieu of the performance of other duties. From the end of January 1983, District Attorney Robert H. Philibosian knew and generally approved of this work. County employee Alan Wilkins acted as staff director of the CCJCC and in this capacity arranged and attended meetings of the CCJCC and the legislative subcommittee and prepared minutes of these meetings in lieu of performing other county duties. On January 28, 1983, deputy district attorneys formulated and prepared a 45-page "tentative draft" on the 7 major components of the proposed draft initiative in lieu of the performance of other duties. This document was typed by county employees in lieu of performing other duties.

During his normal working hours on February 4, 1983, Assistant Sheriff Edmonds drafted a letter to Paul Gann, utilizing county secretarial services and supplies. The letter reads in pertinent part: "I'm writing you as Chairman of the Legislative Subcommittee of the Los Angeles County-wide Criminal Justice Coordination Committee. As [Mr.] Timmons, Staff

Assistant to the Subcommittee, indicated to you on the phone, our group is working on the drafting of a Speedy Trial Initiative, which we hope to place on the June 1984 ballot. [¶] As [Mr. Timmons] also told you, the substance of the Initiative is still the source of subcommittee deliberations, so I cannot go into specifics on its content until mid-February. I did, however, want to . . . let you know who we are and what the Initiative effort is about.

"The Committee, itself, was created almost two years ago by the Board of Supervisors in the wake of a drastic upturn in violent crime. It is the expressed purpose of the Committee to increase coordination among the elements of the local justice system in Los Angeles County and to open up communications with local elected officials. We have . . . become the focus of local coordination efforts in justice issues. [¶] The first discussions of the initiative were begun last fall when it became increasingly clear that many improvements in the justice system which the committee supports have previously and unsuccessfully been introduced in the Legislature, and that the initiative process may hold out our only hope of implementing much needed change. . . . [¶] We would appreciate any suggestions you might have on subsequent steps which need to be taken. These include fund raising ideas which you engaged in for the Victims' Bill of Rights Initiative and your thoughts on other group[s] which might be interested in assisting us."

On February 10, 1983, the legislative subcommittee reported by letter to CCJCC on the seven proposals developed by the subcommittee, recommending: "(1) that the proposals be approved for inclusion in the Initiative, and (2) that the subcommittee be instructed to draft the legal wording for the Initiative, to be reviewed and approved at the [CCJCC's] March 16 meeting." This seven-page document was typed by a county employee in the normal course of her work day on county stationery.

During a February 16, 1983, meeting of CCJCC, the proposals were approved and adopted as submitted; 18 members voted in favor of approval and adoption, while 1 voted against and none abstained. The minutes of this meeting further record: "The Legislative Subcommittee will draft the initiative's final wording and preamble and present it at the March meeting. The final wording must be presented to the Atorney [*sic*] General's office for title and summary by May 24, 1983. Mr. Edmonds indicated that the next subject to address was the identification of a proponent or proponents who would be responsible for moving the initiative forward. [¶] Sherman Block proposed the appointment of a subcommittee for the purpose of recommending or securing possible proponents for the initiative." A speedy trial initiative task force was appointed, its members including Sheriff Block, District Attorney Philibosian, Donald G. Galloway and David Snowden.

During February and March 1983, deputy district attorneys formulated a first draft of the proposed initiative in lieu of the performance of other duties. One deputy received compensatory overtime from the county for his work. The 20-page first draft was prepared by county typists during normal working hours in lieu of performing other duties. These same county employees also prepared three tentative summaries of the draft proposed initiative, totaling four pages in length, during normal working hours and in lieu of performing other duties. In March, April, May and June 1983, deputy district attorneys analyzed and wrote memoranda responding to criticism of the draft proposed initiative from the Ventura County District Attorney and others in which they made determinations whether changes should be made in response to the criticism. They performed these tasks during normal working hours in lieu of performing other duties.

Thereafter, in June 1983, these deputy district attorneys formulated a second draft of the proposed initiative in lieu of the performance of other duties. The 20-page second draft was prepared by county typists during normal working hours in lieu of performing other duties. Copies of each draft were made by county employees during normal working hours in lieu of performing other duties while utilizing county facilities and supplies. The drafts were distributed to members of the legislative subcommittee and the CCJCC by county employee Alan Wilkins. The first draft was approved by CCJCC and the second by the legislative subcommittee. Sheriff Block was driven to a meeting of the subcommittee by a county employee in a county vehicle. At this meeting, Sheriff Block expressed support for some of the draft proposed initiative provisions and offered "input." In addition, he reviewed these drafts at CCJCC meetings and discussed them with Assistant Sheriff Edmonds.

Director of the Bureau of Special Operations of the Office of the District Attorney Richard W. Hecht received copies of the proposed initiative drafts, after which he spent time reviewing them and suggesting changes in lieu of the performance of other duties. In response to a directive from District Attorney Philibosian, Mr. Hecht prepared and distributed on February 17, 1983, at county expense, a memorandum to all head deputies and deputies in charge (approximately 10 to 12 of the approximately 110 deputy district attorneys). The memorandum reads in pertinent part: "As the newspapers have indicated, this department is strongly advocating appropriate legislative changes which would permit an acquittal or conviction to occur where 10 members of the jury arrived at such a verdict [except], of course, . . . in capital cases. [¶] If you, or any of your deputies, have tried a case within the past two years where the jury has hung up either for guilt or innocence by a 10-2 or 11-1 vote, would you please send me a one-page

memorandum setting forth the relevant facts and any known reasons for the hang up—as soon as possible."

Mr. Hecht communicated the results of this survey to a deputy district attorney designated by District Attorney Philibosian. On one occasion, he received compensatory overtime from the county for working on a draft of the proposed initiative. In addition, he personally requested Deputy District Attorney Sondheim of the appellate division to draft a preamble, an initiative summary and a fiscal impact statement concerning the proposed initiative. He never requested that members of the appellate division keep time cards for their work on the draft proposed initiative.

While research and consideration of the provisions to be included in a proposed draft initiative was in progress, Deputy District Attorney Sondheim assigned an employee to gather statistics relating to the nonunanimous jury verdict provision under consideration. He was to use PROMIS, an automated statistical system owned by the county. Mr. Sondheim assigned a law clerk, compensated by the hour, to review the statistics. Thereafter, a county employee verified the accuracy of the survey by examining approximately seventy case files over a period of two to three days. A law clerk spent approximately two days assisting in this process. In addition, employees prepared a chart for the legislative subcommittee outlining the frequency of 10-2 or 11-1 hung jury verdicts. In each instance, the county employee did these tasks in lieu of performing other duties and utilized county equipment and supplies.

During the 1983-1984 session of the Legislature, legislation was introduced proposing constitutional amendments on the following subjects: ACA 37, judicial voir dire, introduced March 4, 1983; ACA 6, indictment by grand jury, introduced January 26, 1983; ACA 41, providing for 10-2 verdicts in noncapital criminal cases, introduced February 11, 1983; and ACA 45, to the same effect, introduced May 17, 1983. None of this legislation was passed and none precisely parallels the provisions of the proposed draft initiative.

The speedy trial task force first met at approximately 2:30 p.m. on February 28, 1983, at the Office of the District Attorney in the criminal courts building. At this meeting task force members discussed identifying and obtaining a proponent for the draft proposed initiative. In May and June 1983, the task force met separately once with Mr. Sullivan of Cal-Tax, once with Mr. Forde of the campaign management firm of Butcher-Forde Consulting and once with Mr. Evelle J. Younger to explore proponents for the draft proposed initiative.

Prior to July 6, 1983, the task force discussed a proposal from Butcher-Forde Consulting concerning direct mail solicitation of popular and financial support for the draft proposed initiative and the signature gathering effort. The task force considered the qualification requirements for the draft proposed initiative and concluded a direct mail effort of gathering signatures would be too costly; as a possible alternative, the task force discussed the feasibility of person-to-person signature gathering using law enforcement personnel. Butcher-Forde Consulting was not engaged by any public agency or the eventual proponents to assist in the initiative process. During this time, the task force also discussed other presentations on obtaining political and financial support for the draft proposed initiative. By July 8, 1983, the task force had identified two willing proponents, Evelle J. Younger and Robert Kane. It reported this result to CCJCC, recommending that the task force be terminated but CCJCC staff be instructed to continue to monitor the progress of the proponents toward qualification of the proposed initiative.

County employee Alan Wilkins prepared and sent notices of task force meetings, as was his duty, during normal working hours and in lieu of performing other duties. Mr. Wilkins and Mr. Timmons attended, as did Sheriff Block and District Attorney Philibosian. Sheriff Block regularly is assigned the use of a salaried county driver and a county owned automobile for which the county supplies gasoline; he used this vehicle to attend task force meetings, which always were scheduled during normal working hours. He took no vacation time to pursue these activities.

The district attorney and sheriff are assigned and authorized to use county owned vehicles and salaried county drivers for purposes of security and facilitated communication with their offices. According to Clayton Anderson, chief of the bureau of investigation in the office of the district attorney, it is his responsibility to provide security for the district attorney and ensure the district attorney's ability to communicate with any member of his office or any other county agency at all times. The district attorney is on duty continuously; he is often required to communicate with his deputies, police officers, investigators, and court personnel at night or on weekends or holidays.

The county vehicle provided to him, with its two-way radio communication, is the primary means of facilitating his ability to communicate and is an essential component in protecting his security. A command post has orders to contact the district attorney immediately in the event of certain emergencies or other significant occurrences. According to the assistant chief administrative officer for the county, Ted Reed, the sheriff has similar

duties and needs. Both he and the district attorney are authorized to use 24 hours a day a county vehicle equipped with special communications equipment designed to permit each official to be in communication with his office at any time. In addition, each is authorized to use sworn peace officers to assist, drive and provide security at any time these elected officials deem necessary.

Sheriff Block and District Attorney Philibosian joined a citizens committee which supported, and identified themselves to the public as personally supporting, the qualification and passage of the proposed draft initiative. On occasion, from May 1983 to February 1, 1984, District Attorney Philibosian and Sheriff Block were transported in county owned automobiles, often by salaried county drivers, to various meetings which involved promoting the qualification of the proposed initiative. In addition, they occasionally discussed in their respective county offices the drafts of the proposed initiative with other persons, stating their support for its qualification and passage.

District Attorney Philibosian sent a letter to a private citizen, responding to an inquiry concerning the proposed initiative, utilizing county stationery and the services of a county typist. The letter, dated March 28, 1983, reads in pertinent part: "Thank you very much for your interest as a concerned citizen regarding the Speedy Trial Initiative. [¶] I am particularly pleased to hear from you since I am a native San Diegan." He also corresponded in the same manner with Central District Acting United States Attorney Alexander H. Williams III. That letter, dated September 23, 1983, reads in pertinent part: "Thank you for your letter regarding the Criminal Court Reform Initiative. I am extremely pleased to have you as an ally in our effort to reform California's Judicial system."

The proposed initiative was filed with the Attorney General for title and summary in late July 1983 by its proponents, Evelle J. Younger and Robert K. Kane. The official summary date of the proposed initiative is September 13, 1983.

On November 9, 1983, a deputy district attorney drafted a suggested core speech concerning the proposed initiative. District Attorney Philibosian used parts of the speech during various speaking engagements in some of which he supported the qualification of the proposed initiative. The suggested core speech provides in considerable detail much information which would be useful to a citizen in deciding whether to sign the initiative petition. It does not, however, mention or address the concerns of opponents to the proposed initiative or critical input the legislative subcommittee of

CCJCC had received during the drafting process. It ends with the following sentence: "I urge you to support it."

District Attorney Philibosian requested the appellate division of the office of the district attorney to write an article for a California District Attorney's Association publication concerning the preliminary hearing provisions of the proposed initiative. Deputy District Attorney Sondheim assigned the task of drafting the article to Deputy District Attorney Messer. It took Mr. Messer approximately four days to prepare the article; he performed this task during normal working hours in lieu of performing other duties. Mr. Messer's handwritten draft of the article was reviewed and edited by Mr. Sondheim, after which it was typed by county employees on county stationery and photocopied on a county copier using county supplies. The article is fundamentally informational in tone and presents the concerns of opponents to the proposed changes in preliminary hearing procedures.

On November 15, 1983, the board of supervisors officially recorded its position as supporting the proposed initiative. On February 17, 1984, the Secretary of State gave official notification the proposed initiative had not received sufficient signatures to qualify for the ballot and, hence, the petition for the initiative had failed.

## CONTENTIONS

### I

Plaintiffs contend the trial court erred in adjudicating summarily that defendants' expenditures to develop, draft and find a sponsor for the proposed initiative measure were not unlawful.

### II

Plaintiffs further contend the trial court erred in summarily adjudicating that defendants' failure to report expenditures made to develop, draft and promote the proposed initiative did not violate the Political Reform Act.

## DISCUSSION

### I

Plaintiffs contend the trial court erred in adjudicating summarily that defendants' expenditures to develop, draft and find a sponsor for the proposed initiative measure were not unlawful. We disagree.

The seminal California case dealing with the expenditure of public funds in relation to a ballot measure is *Mines* v. *Del Valle* (1927) 201 Cal. 273 [257 P. 530]. In *Mines,* the city council called an election to submit a bond issue for municipal improvements, specifically the expansion of electrical power plants. Thereafter, the department of public services submitted claims to the city council for printing cards, banners, automobile windshield stickers and banners, labels, circulars and postal cards distributed and circulated; for newspaper ads and for the construction of a float. All these expenditures were incurred during the election campaign period for the purpose of influencing voters in favor of the bond issue. The city council paid the claims. (At pp. 275-277.) To justify the expenditures as made for a proper public purpose, the defendants relied on a city charter provision governing the board of public services commissioner's authority to extend electrical plants and works under its charge, arguing it necessarily had implied power to do anything necessary to the execution of the express power. Defendants reasoned one necessary step was raising funds with which to extend these works which, in this case, could only be accomplished by bond issue and defendants thus were authorized also to spend a reasonable sum on ensuring the success of the bond issue. (*Id.,* at p. 282.)

The court notes in response: "The vice of this argument is in assuming that the raising of the necessary funds is any part of the power to extend said electrical system. We may all concede that the system cannot be extended without funds . . . [, b]ut the raising of the money to extend [it] is one thing and the extension of it an entirely different and distinct power. The [relevant] provisions of the charter . . . cannot be enlarged to include another and distinct power, that of raising money either directly or indirectly for the conducting and operating . . . or for the purpose of extending the business thereof"; the authority to determine public necessity for a bond issue clearly lay with the city council. (201 Cal. at pp. 282-283.) In the court's view, the practical question thus was whether the funds properly could have been expended to influence approval of the bond issue. (*Id.,* at p. 283.)

The court then observes voters opposing the bond issue had rights to the expended public funds equal to those of voters supporting it; therefore, the use of public funds to further the bond issue was illegal unless the power was given to the governmental agency expending the funds in clear, unequivocal language. (201 Cal. at p. 287.) *Mines* concludes the authority for such an expenditure "was not given to [defendants] by any express provisions of the charter, nor can it be implied from any of the terms thereof"; nothing can invest defendants with authority denied by the charter. (*Id.,* at p. 288.)

The California Supreme Court next addressed the issue in *Stanson* v. *Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1]. In *Stanson,* the California Department of Parks and Recreation printed materials which promoted approval of an initiative bond measure appearing on the next ballot, as well as sending to plaintiff at the department's expense privately printed materials favoring its passage. In addition, the department spent state funds on speaking engagements and travel expenses to promote passage and a three-person staff worked exclusively on promoting passage. (At pp. 210-211.) *Stanson* begins its discussion "with the general principle that expenditures by an *administrative official* are proper only insofar as they are authorized, explicitly or *implicitly,* by legislative enactment. Contrary to defendant's contention below, such executive officials are not free to spend public funds for any 'public purpose' they may choose, but must utilize appropriated funds in accordance with the legislatively designated purpose. 'It is the policy of the law in the absence of a clearly negatived intention to have . . . funds authorized for a particular purpose expended for such purpose.' [Citations.]" *(Id.,* at p. 213, italics added.)

*Stanson* then notes, with respect to the defendant, there is explicit statutory confirmation of this general principle in Public Resources Code section 504, which provides in pertinent part: "The department may expend the money . . . made available by law for the administration of the statutes the administration of which is committed to the department, or for the use, support, or maintenance of any board, bureau, commission, department, office or officer whose duties, powers and functions have been transferred to and conferred upon the department. Such expenditures . . . shall be made in accordance with law in carrying out the purposes for which the appropriations were made or the special funds created." In addition, the 1972 legislative act which approved the park bond issue and submitted the matter to the voters (Stats. 1972, ch. 912, pp. 1620-1629) in section 10 appropriates to the department $50,000 for "advance planning on projects to be financed [(b) For development of real property . . . (c) For development of historical resources . . . (e) For the acquisition of real property . . .]." *(Stanson, supra,* 17 Cal.3d at pp. 213-214 & fn. 2, italics omitted.) However, the court finds no authorizaton for promotion of the bond act's passage in the latter provision. *(Id.,* at p. 214.)

The court then considers whether the necessary authorization may be found in Public Resources Code section 512, which provides in pertinent part: "For the purpose of disseminating information relating to its activities . . . duties, or functions, the department may issue publications . . . and perform such acts and carry on such functions as in the opinion of the director will best tend to disseminate such information." Since the department's duties include a responsibility "(1) to investigate and report on the

public recreational needs of the state [citation], (2) to devise long-range plans necessary to meet such needs [citation], and (3) to assist the Park and Recreation Commission in the 'protection and *development* of the state park system' ([italics] added) [citations]" *(Stanson, supra,* 17 Cal.3d at p. 215), defendant argued it was authorized to expend public funds to disseminate information concerning the public need for the bond issue *(id.,* at pp. 215-216). However, the court concludes this is equivalent to the general provision interpreted in *Mines* v. *Del Valle, supra,* 201 Cal. 273.

Inasmuch as the issue had not arisen since *Mines, Stanson* then turns its attention to pertinent out-of-state authorities, noting: "In *Citizens to Protect Pub. Funds* v. *Board of Education* (1953) 13 N.J. 172 [98 A.2d 673], . . . the New Jersey Supreme Court[ ] considered the legality of a school board's expenditure of public funds for the publication of an 18-page booklet concerning a school building program which was the subject of an upcoming bond election. Most of the booklet contained factual information as to the need for the proposed school facilities and the cost of the proposed project, but three of the booklet's pages contained the simple exhortation 'Vote Yes,' 'Vote Yes' and an additional page warned of the dire consequences that would result 'if You Don't Vote Yes.'

"Focusing on these latter portions of the booklet, the New Jersey court declared that in publishing such material 'the board made use of public funds to advocate one side only of the controversial question without affording the dissenters the opportunity by means of that financed medium to present their side, and thus imperilled the propriety of the entire expenditure. The public funds entrusted to the board belong equally to the proponents and opponents of the proposition, and the use of the funds to finance . . . only one side . . . gives the dissenters just cause for complaint. The expenditure is then not within the implied power and is not lawful in the absence of express authority from the Legislature.' (98 A.2d at p. 677.) [¶] Indeed, every court which has addressed the issue to date has found the use of public funds for partisan campaign purposes improper, either on the ground that such use was not explicitly authorized [citations] or on the broader ground that such expenditures are never appropriate. [Citation.] As in the instant case, the majority of these decisions related to expenditures in connection with bond elections.

"Underlying this uniform judicial reluctance to sanction the use of public funds for election campaigns rests an implicit recognition that such expenditures raise potentially serious constitutional questions. A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions. A principal danger feared by our coun-

try's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office [citations]; the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process." (17 Cal.3d at pp. 216-217.)

*Stanson* next rejects the argument that the use of public funds to promote a ballot measure or bond issue "should be upheld by analogy to the more generally accepted practice of expending public funds for legislative 'lobbying' efforts. [Citations.]" (17 Cal.3d at p. 218.) After noting past authorities have made no such distinction, *Stanson* addresses the substantive defects in the argument: "[T]he suggested analogy between election campaigning and legislative lobbying ignores important distinctions between the two activities. To begin with, California statutes draw a clear distinction between the two matters; while various provisions authorize public expenditures for appropriate legislative lobbying activities [citations], no similar provision sanctions the use of public funds in election campaigns. [Citation.]

"More fundamentally, while public agency 'lobbying' efforts undeniably involve the use of public funds to promote causes which some members of the public may not support, one of the primary functions of elected and appointed executive officials is, of course, to devise legislative proposals to attempt to implement the current administration's policies. Since the legislative process contemplates that interested parties will attend legislative hearings to explain the potential benefits or detriments of proposed legislation, public agency lobbying, within the limits authorized by statute . . . . , in no way undermines or distorts the legislative process. By contrast, the use of the public treasury to mount an election campaign which attempts to influence the resolution of issues which our Constitution leave[s] to the 'free election' of the people [citation] does present a serious threat to the integrity of the electoral process." (17 Cal.3d at p. 218.)

After holding no " 'clear and unmistakable [statutory] language' " authorizes defendant's expenditure of public funds for partisan campaigning (17 Cal.3d at pp. 219-220), *Stanson* clearly sets the limits of its holding. "It does not necessarily follow, however, that the department was without power to incur *any* expense at all in connection with the bond election. In *Citizens to Protect Pub. Funds* v. *Board of Education, supra,* 98 A.2d 673, the New Jersey . . . court, while condemning the . . . use of public funds to advocate only one side of an election issue, at the same time emphatically affirmed the school board's implicit power to make 'reasonable expenditures for the purpose of giving voters relevant facts to aid them in reaching an informed judgment when voting upon the proposal.' (98 A.2d at p. 676.)

. . . The administrative agency involved [here] does not, of course, enjoy the same broad legislative and fiscal authority possessed by [that] locally autonomous school board. . . . Section 512 of the Public Resources Code does, however, grant . . . explicit authority to disseminate information relating to . . . activities which include the investigation and assessment of the state's long range recreational needs and the preparation of plans to meet such needs. . . . [R]easonably construed, the section [provides] . . . authority to spend [budgeted informational] funds to provide the public with a 'fair presentation' . . . relating to a park bond issue on which the agency has labored." (17 Cal.3d at pp. 220-221, italics original, fn. omitted.)

Of interest in *Citizens to Protect Pub. Funds* v. *Board of Education, supra,* 98 A.2d 673, on which *Stanson* so heavily relies, is the observation that "when the program [before the electorate] represents the [public] body's judgment of what is required in the effective discharge of its responsibility, it is not only the right, but perhaps the duty of the body to endeavor to secure the assent of the voters thereto. . . . It is the expenditure of public funds in support of one side only . . . which is outside the pale." (At pp. 677-678.)

The issue next arose in *Miller* v. *Miller* (1978) 87 Cal.App.3d 762 [151 Cal.Rptr. 197] (*Miller I*), which involved an action challenging expenditures made by personnel of a state agency, the California Commission on the Status of Women. Defendants acknowledged they prepared brochures, white papers and news articles, radio tapes and television spot announcements as well as making speeches and public appearances advocating the Legislature's ratification of the Equal Rights Amendment (ERA) to the United States Constitution. (At pp. 765-766.) Thus, as the court noted, "[t]he Commission . . . readily acknowledges that it is openly and actively involved in the promotion nationally of ratification of the ERA . . . both at the legislative and the grass-roots levels. . . . Since the Commission is maintained at public expense, part at least of such activity necessarily is paid for by and with public funds." (*Id.,* at p. 766.)

In *Miller I,* both parties argued ratification of a national constitutional amendment was not an electoral process; from this, defendants asserted their activity was closely akin to "legislative lobbying," an authorized activity while plaintiffs, noting a Legislature has no power to change the proposed amendment but only to vote aye or nay, asserted this established ratification was not a legislative process and therefore not a proper object for legislative lobbying. (87 Cal.App.3d at p. 767.) The court found such labeling less than helpful, defining the real issue posed by *Stanson* v. *Mott, supra,* as "not the *objective* of the promotional activity but the *audience* to

which it is directed. . . . It is one thing for a public agency to present its point of view to the Legislature. It is quite another for it to use the public treasury to finance an appeal to the voters to lobby their Legislature in support of the agency's point of view. The latter 'undermines or distorts the *legislative* process' just as clearly as 'the use of the public treasury to mount an election campaign . . . [distorts] the integrity of the *electoral* process.' [Citation.]" (87 Cal.App.3d at pp. 768-769, italics original.)

The court further notes: "One of the cases cited with approval in *Stanson, Stern* v. *Kramarsky* (1975) 84 Misc.2d 447 [375 N.Y.S.2d 235], concerned the identical issue here. . . . 'The spectacle of state agencies campaigning for or against propositions or proposed constitutional amendments to be voted on by the public, albeit perhaps well-motivated, can only demean the democratic process. As a State Agency supported by public funds they cannot advocate their favored position on any issue or for any candidates, as such. So long as they are an arm of the state government they must maintain a position of neutrality and impartiality.

" 'It would be establishing a dangerous and untenable precedent to permit the government. or any agency thereof, to use public funds to disseminate propaganda in favor of or against any issue or candidate. This may be done by totalitarian, dictatorial or autocratic governments but cannot be tolerated, directly or indirectly, in these democratic United States of America. This is true even if the position advocated is believed to be in the best interests of our country. [¶] To educate, to inform, to advocate or to promote voting on any issue may be undertaken, provided it is not to persuade nor to convey favoritism, partisanship, . . . approval or disapproval by a State agency of any issue, worthy as it may be.' (375 N.Y.S.2d at p. 239.)" (*Miller I, supra,* 87 Cal.App.3d at pp. 769-770; see also *Stanson* v. *Mott, supra,* 17 Cal.3d at p. 217.)

The court then turns its attention to the question of whether there is any " 'clear and explicit' legislative authorization for [the Commission's] advocatory or promotional position on ERA," concluding "[w]e do not find it. Although the Commission is given broad powers to do anything 'which may be necessary, desirable, or proper to carry out the purposes of this chapter' (Gov. Code, § 8224, subd. (b)), such broad statements were held in *Stanson* to be insufficiently ' "clear and unmistakable" . . . .' (17 Cal.3d at pp. 219-220.) Nothing else in the statutes clearly and explicitly authorizes the Commission to urge the public to support the passage of legislative or constitutional measures. Therefore, any expenditures of public funds to marshal public support for the ERA were unauthorized, and the trial court erred in granting summary judgment." (87 Cal.App.3d at pp. 771-772.)

In the instant matter, plaintiffs argue the same reasoning which prohibits governmental entities, officials and employees from utilizing public funds to take a partisan, i.e., adherence "to a party, faction, cause, or person" (Webster's Third New Internat. Dict. (1981) p. 1647, col. 3), stand in support of or opposition to an initiative already drafted and placed on the ballot should apply to the developing and drafting of proposals which would change existing law. They reason, since those who take that task upon themselves necessarily support the contents thereof, developing and drafting an initiative is inherently partisan in nature and thus subject to "election campaigning" proscriptions. Moreover, plaintiffs assert, the audience to which a proposed draft initiative is addressed necessarily is the electorate. This latter assertion is logically flawed and there is authority which suggests the former assertion is legally flawed. :

As *Stanson* v. *Mott, supra,* 17 Cal.3d notes at page 218, "one of the primary functions of elected and appointed executive officials is, of course, to devise legislative proposals to attempt to implement the current administration's policies." While no California authority directly addresses the scope of that function, e.g., whether it extends to the drafting of proposed legislation, out-of-state authority does address the issue. The New Jersey courts have considered the issue on at least three occasions.

*Reilly* v. *Ozzard* (1960) 33 N.J. 529 [166 A.2d 360, 89 A.L.R.2d 612] holds a local governmental entity has the right to seek or oppose legislation affecting its interests and may draft legislation to accomplish that end. (At pp. 368-369.) *Durgin* v. *Brown* (1962) 37 N.J. 189 [180 A.2d 136] follows that holding, finding no impropriety per se in the passage of a resolution directing an attorney to prepare a legislative bill, but concludes the board of education at issue therein went too far; it did *not* have the power to destroy itself or recommend its own demise. (At p. 143.) Finally, *Lanza* v. *De Marino* (1978) 160 N.J.Super. 71 [388 A.2d 1294] follows the same line of reasoning. (At p. 1297.) It is logical to conclude the power to devise legislative proposals to serve a local entity's perceived interests implies the power to draft proposed legislation.

Thus, the only question remaining is whether it also implies the power to draft a proposed initiative measure which may find a sympathetic sponsor when other legislative avenues have proven unavailing. A thorough search discloses no authority in any jurisdiction of this nation on this issue, although *Stevens* v. *Geduldig* (1986) 42 Cal.3d 24 [227 Cal.Rptr. 405, 719 P.2d 1001] came close to deciding it. In *Stevens,* a constitutional amendment was drafted for presentation to the Legislature at public expense and at the direction of the governor; it was later decided to submit the proposed

amendment to the voters as an initiative measure. "During the effort to qualify the measure for the ballot, the task force continued in their uncompleted studies of taxes and spending." (At p. 31.) However, the public employee directly involved "denied that he worked on the initiative on state time. He said he gave some speeches and engaged in some debates . . . but was careful to separate the work of the task force from any involvement with the initiative measure. On several weekends he gathered signatures for the initiative . . . ." (*Ibid.*)

In framing properly the issue presented, the court noted: "The trial court rejected a proposed finding that task force activities encompassed *promotion* of an initiative measure" (42 Cal.3d at p. 36, italics added), instead finding task force activities encompassed the preparation and promotion of a measure intended for submission to the *Legislature* (*ibid.*). Plaintiffs emphasize the latter aspect of the distinction drawn, arguing the Supreme Court thus implicitly found *preparation* activities attending an initiative measure intended for submission to the electorate would have entailed an improper expenditure of public funds. This ignores the actual content of the finding rejected by the trial court which referred to *both* the preparation and promotion of an initiative measure. Hence, the more reasonable interpretation is that the Supreme Court was not concerned with considering the preparation aspect of the proposed finding, in that such activity would not have involved an improper expenditure of public funds. This, however, is the slimmest of reeds upon which to determine the issue.

Nonetheless, if the interests a local governmental entity seeks to serve are legitimate but the Legislature has proven disinterested, there appears to be no logical reason not to imply from the indisputable power to draft proposed legislation the power to draft a proposed initiative measure in the hope a sympathetic private supporter will forward the cause and the public will prove more receptive. ■ " 'The determination of what constitutes a public purpose is primarily a matter for legislative discretion [citations], which is not disturbed by the courts so long as it has a reasonable basis.' " (*Shean* v. *Edmonds* (1948) 89 Cal.App.2d 315, 323 [200 P.2d 879], quoting from *County of Alameda* v. *Janssen* (1940) 16 Cal.2d 276, 281 [106 P.2d 11, 130 A.L.R. 1141]; accord, *Board of Supervisors* v. *Dolan* (1975) 45 Cal.App.3d 237, 243 [119 Cal.Rptr. 347].)

■ There is a sound basis for concluding the formulation and drafting of a proposed initiative does not fall within the purview of that partisan campaigning which requires " 'clear and unmistakable' " statutory authority. (*Stanson* v. *Mott, supra,* 17 Cal.3d at p. 216, italics omitted.) All authority to date on the subject, both in California and in other states, involves

propositions (i.e., initiatives) or bond issues already on the ballot. (In addition to cases previously cited, see, e.g., *Keller* v. *State Bar* (1986) 190 Cal.App.3d 1196, 1208 [226 Cal.Rptr. 448] [expression of particular viewpoint concerning judicial recall elections]; *Phillips* v. *Maurer* (1986) 67 N.Y.2d 672 [499 N.Y.S.2d 675, 676, 490 N.E.2d 542] [urging a particular vote on a ballot measure]; *Mountain States Legal, etc.* v. *Denver School Dist.* (D. Colo. 1978) 459 F.Supp. 357, 360 [urging defeat of a referendum, notwithstanding some explicit state law which might be interpreted as permitting an expression of a particular view].)

The only California case suggesting such explicit authority is necessary solely to permit the advocacy or promotion of particular views concerning proposed electoral matters is *Miller* v. *California Com. on Status of Women* (1984) 151 Cal.App.3d 693 [198 Cal.Rptr. 877] (*Miller II*). That case, however, deals with a state administrative agency—*not* a local government entity possessing broad autonomous legislative and fiscal powers. ▮ It is settled the "[g]overnment has legitimate rights in informing, in educating and in *persuading,* and it may add its voice to the marketplace of ideas on controversial topics." (*Keller* v. *State Bar, supra,* 190 Cal.App.3d at p. 1218, italics added.) It simply may not, "in the guise of governmental speech, trammel the free speech rights of its citizens." (*Ibid.*) Moreover, "If the government . . . cannot appoint a commission to speak on the topic without implicating plaintiffs' First Amendment rights it may not address any other 'controversial' topics. If the government cannot address controversial topics it cannot govern." (*Miller II, supra,* 151 Cal.App.3d at p. 701.)

Further, as defendants note, the courts will look to specific statutes to give definition to a more general provision. For example, in interpreting the "fair trial" provision of Code of Civil Procedure section 1094.5 in the context of hearing board members' receipt of political contributions, the court looked to the Political Reform Act in *Woodland Hills Resident Assn., Inc.* v. *City Council* (1980) 26 Cal.3d 938, 946-947 [164 Cal.Rptr. 255, 609 P.2d 1029]. Similarly, the construction of an act by the agency charged with its enforcement is entitled to considerable deference from the courts " 'and will be followed if not clearly erroneous. [Citations.]' " (*Judson Steel Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 668 [150 Cal.Rptr. 250, 586 P.2d 564], quoting from *Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 325-326 [109 P.2d 935].)

▮ Plaintiffs argue this court should not look to the Political Reform Act or its interpretation by the Fair Political Practices Commission, in that the act does not concern itself with the *legality* of reportable expenditures.

This takes too narrow a view of the act. "The manifest purpose of the financial disclosure provisions of the Act is to insure a better informed electorate and to prevent *corruption* of the *political process*. [Citations.] . . . That a particular expenditure is not improper per se does not negate the public's interest in being apprised of the amount and *manner* in which the money was spent." (*Thirteen Committee* v. *Weinreb* (1985) 168 Cal.App.3d 528, 532-533 [214 Cal.Rptr. 297], italics added.) From the foregoing, it appears the act *does* concern itself to some extent with the legality of the expenses through its concern with "corruption of the political process." (*Id.,* at p. 532.)

California Code of Regulations, title 2, section 18420, subdivision (b) provides in pertinent part: "The payment by a state or local government agency of the salary or expenses of its employees or agents is an expenditure or contribution only if the salary or expenses are for *campaign activities* . . . ." (Italics added.) Such payments are for campaign activities if services are rendered "for political purposes." (Cal. Code Regs., tit. 2, § 18423, subd. (a).) *Thirteen Committee* v. *Weinreb, supra,* interprets the phrase "for political purposes" to mean " '[f]or the purpose of *influencing* or *attempting to influence* the action of the *voters* for or against the . . . [qualification or passage of any measure].' (Cal. Code Regs., tit. 2, § 18225, subd. (a).)" (168 Cal.App.3d at pp. 532-533, italics added.)

Clearly, prior to and through the drafting stage of a proposed initiative, the action is not taken to attempt to influence voters either to qualify or to pass an initiative measure; there is as yet nothing to proceed to either of those stages. The audience at which these activities are directed is not the electorate per se, but only potentially interested private citizens; there is no attempt to persuade or influence *any* vote. (*Miller I, supra,* 87 Cal.App.3d at p. 768.) It follows those activities cannot reasonably be construed as partisan campaigning. Accordingly, we hold the development and drafting of a proposed initiative was not akin to partisan campaign activity, but was more closely akin to the proper exercise of legislative authority.

Like the school district at issue in *Citizens to Protect Pub. Funds* v. *Board of Education, supra,* 98 A.2d 673, the Board of Supervisors of Los Angeles County, a chartered county, has broad autonomous legislative and fiscal authority. (*Stanson* v. *Mott, supra,* 17 Cal.3d at p. 220.) While a chartered county is a political subdivision of the state and its charter is state law (Cal. Const., art. XI, §§ 1, 3; *Olson* v. *Hickman* (1972) 25 Cal.App.3d 920, 923 [102 Cal.Rptr. 248]), it is also classified as a quasi-corporation and exercises corporate powers (Gov. Code, § 23003; *Pitchess* v. *Superior Court* (1969) 2 Cal.App.3d 653, 656 [83 Cal.Rptr. 41]).

Article I, section 1 of the Los Angeles County Charter provides in part: "The County of Los Angeles . . . has all the powers specified by the constitution and laws of the State of California, and by this Charter, and such other powers as are necessarily implied." ■ Charter provisions supersede all laws inconsistent with the charter as to all matters covered in the charter. In addition to specifically enumerated powers, the board of supervisors "may do and perform all other acts and things required by law not enumerated in this part, or which are necessary to the full discharge of the duties of the legislative authority of the county government." (Gov. Code, § 25207.)

Government Code section 26227 provides in pertinent part: "The board of supervisors of any county may appropriate and expend money from the general fund . . . to establish county programs or to fund other programs deemed by the board of supervisors to be necessary to meet the social needs of the population . . . including but not limited to, the areas of health, law enforcement, public safety, . . . and legal services . . . . The board of supervisors may contract with other public agencies or . . . individuals to operate such programs . . . . In the furtherance of any such program, the board of supervisors may make available to a public agency . . . any real property of the county which is not, and during the time of possession, will not be needed for county purposes, to be used to carry out such programs . . . ."

Section 2.04.030 of the Los Angeles County Code provides in pertinent part: "In all cases not otherwise provided for by these rules or by ordinance of the board of supervisors, each . . . deputy shall have the powers and may perform the duties attached to the office of his principal . . . subject to the direction and control of his principal . . . ." Hence, the board of supervisors may, under appropriate direction and control, create commissions or committees to which it delegates authority.

■ It is apparent the foregoing provisions in their totality confer implicit authority for the board of supervisors to create the CCJCC, whose "expressed purpose" is "to increase coordination among the elements of the local justice system in Los Angeles County and to open up communications with local elected officials[, and] . . . become the focus of local coordination efforts in justice issues."

There can be no doubt the efficacy of present criminal justice procedures and the possible need for significant procedural reform are issues of fundamental interest to the board of supervisors. The county has an abiding interest in the administration of justice, for it has a state-imposed legal duty

to provide adequately for the functioning of both superior and municipal courts. (See, e.g., *Villanazul* v. *City of Los Angeles* (1951) 37 Cal.2d 718, 724 [235 P.2d 16]; *County of Los Angeles* v. *Byram* (1951) 36 Cal.2d 694, 699 [227 P.2d 4].) Hence, the increasingly slow progress of the administration of justice and rapidly rising costs are of the highest, most basic concern to the county.

It also appears the research into, study and development of proposed means to reduce cost and speed the course of justice through fundamental procedural reforms in the criminal justice system beyond the power of the County to enact is not within the mandate of any other county agency. The Commission on Judicial Procedures is limited, in cooperation with the courts and the California Judicial Council, to making "recommendations for action by the board of supervisors on legislation pertaining to the Superior Court and municipal courts" and recommending "to the board of supervisors changes and improvements in judicial administration for the purposes of providing swifter, more efficient and more economical justice, and for reducing case loads and delays for litigants." (L.A. County Code, § 3.34.060.) By any reasonable construction, this contemplates changes the board of supervisors might itself undertake or urge upon the courts in its jurisdiction.

In sum, there is a sufficiently fundamental interest in basic criminal justice procedural reform for the board of supervisors to include the formulation and drafting of measures to effectuate those aims within the mandate of the CCJCC. Neither is there a coexisting county agency undertaking that task. On the foregoing basis, we conclude CCJCC's appointment of a legislative subcommittee with directions to consider possible procedural reforms in the criminal justice system and to explore the possibility of an initiative measure as the vehicle to attain desired reforms was a reasonable exercise of power the board of supervisors properly delegated to CCJCC. It follows activities undertaken at the direction of that subcommittee from research into the need for various types of reform and the gathering of statistical information concerning the problems associated with specific areas of possible reform to the proposal of various substantive procedural reforms and the drafting of a proposed initiative measure were within the implicit authority thus conferred.

This brings us to the question of whether CCJCC's mandate reasonably can be construed as broad enough to encompass creation of the speedy trial task force with directions to identify and approach an appropriate sponsor for the draft proposed initiative and to investigate the probable expense and alternative means of a proponent successfully undertaking a campaign to

qualify the proposed initiative for the ballot. In view of the definition of "campaign activity" developed *ante* and CCJCC's implicit authority to direct preparation of a draft proposed initiative, the latter activities properly lay within CCJCC's mandate.

Investigating the probable cost of available alternative procedures a proponent might use successfully in an effort to qualify the proposed initiative for the ballot and the resources a qualified and willing proponent would need was essential to an informed determination whether to continue with or abandon the initiative approach to securing the desired legislative changes. It was well within the purview of CCJCC's legitimate interests to make that determination, for it assuredly had authority to draft proposed legislation for approval by the board of supervisors and advancement in the Legislature through lobbying efforts. (Gov. Code, § 50023.) It could not reach a reasonable conclusion as to which avenue to pursue in the future without such information.

Whether CCJCC legitimately could direct the task force to identify and secure a willing sponsor is somewhat more problematical. The power to direct the preparation of a draft proposed initiative does not necessarily imply the power to identify and secure a willing proponent to sponsor it thenceforward. On the one hand, it can be argued the power to draft the proposed initiative is essentially useless without the power to seek out a willing proponent and the latter power thus must be implied. On the other hand, it can be argued this brings CCJCC, as an arm of the board of supervisors, too close to impermissible publicly funded political activity, in that it necessarily involves some degree of advocacy or promotion. The logical force of the latter view depends largely on the approach the task force employed in identifying a willing proponent. Unfortunately, the record sheds no light on that subject.

The stipulated facts and exhibits upon which all parties tried their respective motions for the summary adjudication of issues reveal only that the task force "met separately once with Mr. Sullivan of Cal-Tax, once with . . . the campaign management firm of Butcher-Forde Consulting, and once with Mr. Evelle Younger to explore appropriate proponents." At various meetings it "listened to presentations on, and generally discussed methods of, obtaining political . . . support." In addition, by July 8, 1983, the task force had "identified two persons who agreed to act as proponents . . . , Evelle Younger and Robert Kane." This provides little to clarify whether the task force aggressively advocated to these individuals and organizations their participation as proponents or simply requested their suggestions which resulted in Mr. Younger's and Mr. Kane's agreement to so act,

unless one focuses on the phrase "to *explore* appropriate proponents." (Italics added.)

In securing a judgment in this matter, the parties stipulated there are no triable issues of material fact as to any of the matters determined by the judgment. Hence, the issue must be resolved on the evidence before this court.

There is no authority which provides useful guidance on this subject, other than the principle enunciated *ante,* that the nature of a public purpose primarily is a matter for legislative discretion which will not be disturbed if it is supported by a reasonable basis. (*County of Alameda* v. *Janssen, supra,* 16 Cal.2d at p. 281; *Board of Supervisors* v. *Dolan, supra,* 45 Cal.App.3d at p. 243.) That any of the foregoing activities may have benefitted those private parties who eventually became the sponsors and official proponents of the draft proposed initiative does not, in itself, necessitate the conclusion public funds were expended improperly. ■ So long as a public purpose is served, there is no unlawful expenditure of public funds even though there may be incidental benefits to private persons. (*Ibid*.) ■ On balance, we conclude the power to draft the proposed initiative necessarily implies the power to seek out a willing proponent. We do not perceive the activities of identifying and securing such a proponent for a draft initiative as entailing any degree of public advocacy or promotion, directed at the electorate, of the single viewpoint embodied in the measure.

To the extent CCJCC had authority to direct the performance of the above acts, it is clear the county's elected officers had authority to participate in CCJCC and its subcommittees and to perform a broad spectrum of tasks at public expense. It is only at the point the activities of CCJCC and its subcommittees cross the line of improper advocacy or promotion of a single view in an effort to influence the electorate that the actions of elected officers or their deputies, undertaken at public expense, likewise would become improper.

■ The district attorney is both a state and a county official in exercising the powers for which he has been elected. (*Pitchess* v. *Superior Court, supra,* 2 Cal.App.3d at p. 657.) He or she is specifically designated an elected officer of a county by Government Code section 24000, subdivision (a), and the Los Angeles County Charter, article IV, section 12. The sheriff falls into the same category (Gov. Code, § 24000, subd. (b); L.A. County Charter, art. IV, § 12) and, in addition, is an officer of the courts (*Pitchess, supra,* 2 Cal.App.3d at p. 657).

In general, the district attorney is the public prosecutor and, as such, "shall attend the courts, and within his or her discretion shall initiate and conduct on behalf of the people all prosecutions for public offenses." (Gov. Code, § 26500.) In addition, he or she "may sponsor, supervise, or participate in any project or program to improve the administration of justice." (Gov. Code, § 26500.5.) The sheriff is charged with the duty of preserving the peace, "and to accomplish this object may sponsor, supervise, or participate in any project of crime prevention, rehabilitation of persons previously convicted of crime, or the suppression of delinquency." (Gov. Code, § 26600.) Except as otherwise provided for by the board of supervisors, "each deputy shall have the powers and may perform the duties attached to the office of his principal . . . subject to the direction and control of his principal . . . ." (L.A. County Code, § 2.04.030.)

The foregoing principles and statutory authorizations provide direct or implied authority for the district attorney, the sheriff and their respective deputies to participate in CCJCC, its subcommittees and pursue at public expense any activity legitimately within the scope of CCJCC's mandate other than the advocacy or promotion of a single viewpoint with the object of influencing the voters on a particular issue. As discussed *ante,* this includes the authority to consider possible procedural reforms in the criminal justice system and to explore the possibility of an initiative measure as the vehicle to attain desired reforms. It extends from research into the need for various types of reform and the gathering of statistical information concerning the problems associated with specific areas of possible reform to the proposal of various substantive procedural reforms and the drafting of a proposed initiative measure. It also includes the power to investigate the probable expense and alternative means of a proponent successfully undertaking a campaign to qualify the proposed initiative for the ballot, as well as the authority to identify and secure a willing sponsor for the initiative.

It clearly does not include acts of advocacy undertaken once the filing process began. Neither letter drafted and sent by District Attorney Philibosian at county expense involves such advocacy. The letter to the private citizen is entirely neutral and, indeed, innocuous in tone. The letter to the acting United States attorney fairly can be characterized only as falling within the district attorney's official duties relating to CCJCC. The United States attorney for the central district was, after all, a member of that body.

Both the district attorney and the sheriff and, indeed, any other county employees were free to join a citizen's group supporting the legislative goals expressed in the proposed initiative; as individuals, they had the right to

advocate qualification and passage of the initiative. What they could not do, in general, is expend public funds to further that end. The use of public employees, supplies and other resources such as automobiles and drivers thus generally would be proscribed. (Cf. *Fair Political Practices Com.* v. *Suitt* (1979) 90 Cal.App.3d 125, 131 [153 Cal.Rptr. 311].) It appears clear, however, that the use of county owned vehicles and county paid drivers by the district attorney and sheriff was not an improper expenditure of public funds whatever the purpose served in using this means of transportation to attend even obviously political meetings.

The county provides the district attorney and the sheriff with automobiles equipped with two-way radios and county paid drivers for security reasons and to enhance their communications with their offices. The district attorney and sheriff are on 24-hour duty and often must communicate with their offices, staff members or other public agencies at odd hours, including nights, weekends and holidays. The provision of county owned vehicles with special communications systems and county paid drivers also enhances efforts to ensure their individual security. Each elected official is authorized the 24-hour use of such vehicles and the use of peace officers as drivers or for other job-related purposes as they deem necessary. Given the purpose underlying provision of the vehicles and drivers to the district attorney and sheriff and the breadth of their authority to utilize these tools, the nature of the activity to which they are driven in county owned vehicles logically has no bearing on the legitimacy of this expenditure of public funds.

## II

Plaintiffs further contend the trial court erred in summarily adjudicating that defendants' failure to report expenditures made to develop, draft and promote the proposed initiative violated the Political Reform Act. Again, we disagree.

Government Code section 81002, subdivision (a) requires that "[r]eceipts and expenditures in election campaigns should be fully and truthfully disclosed," but in no provision does the Political Reform Act define the phrase "election campaigns." Plaintiffs thus rely on the common dictionary meaning of the word "campaign" as "[a] connected series of operations designed to bring about a particular result." (Webster's Ninth New Collegiate Dict. (1985) p. 199.)

Plaintiffs note the act is intended to regulate contributions or expenditures "for the purpose of . . . attempting to influence the action of voters for or against . . . the passage or defeat of any measure." (Former Gov.

Code, § 82013, repealed by Stats. 1980, ch. 289, § 1.2, p. 600.) They then look to the definition of "influencing legislative or administrative action" as "promoting, supporting, influencing, modifying, opposing or delaying any legislative or administrative action by any means, including but not limited to the provision or use of information, statistics, studies or analyses" (Gov. Code, § 82032). In addition, they turn to the definition of "measure" as "any . . . proposition which . . . is intended to be submitted to a popular vote at an election by initiative . . . whether or not it qualifies for the ballot." (Gov. Code, § 82043.)

From these definitions, plaintiffs reason *every* activity undertaken by defendants from consideration of the possibility of formulating a draft proposed initiative measure through the provision of statistical data and drafting of a proposed initiative to the securing of a willing proponent and provision of information to the public thereafter concerning the proposed initiative involves the expenditure of funds which must have been reported under the act. Taken at face value, this line of reasoning appears fairly persuasive. However, what is at issue here is general statutory construction.

The duty of the court "is simply to ascertain and declare what is in terms or in substance contained [in a statutory scheme], not to insert what has been omitted . . . ." (Code Civ. Proc., § 1858.) ▪ "It is . . . against all settled rules of statutory construction that courts should write into [ ] statute[s] by implication express requirements which the Legislature itself has not seen fit to place in the statute[s]." (*People* v. *White* (1954) 122 Cal.App.2d 551, 554 [265 P.2d 115]; see *Estate of Tkachuk* (1977) 73 Cal.App.3d 14, 18 [139 Cal.Rptr. 55].) ▪ Further, a court must look to the entire statutory scheme so that all parts may be harmonized and given effect. (*Stafford* v. *Realty Bond Service Corp.* (1952) 39 Cal.2d 797, 805 [249 P.2d 241]; *Mendez* v. *Kurten* (1985) 170 Cal.App.3d 481, 485 [215 Cal.Rptr. 924].) ▪ As noted *ante,* the construction of an act by the agency charged with its enforcement is entitled to considerable deference from the courts " 'and will be followed if not clearly erroneous. [Citations.]' " (*Judson Steel Corp.* v. *Workers' Comp. Appeals Bd., supra,* 22 Cal.3d 658, 668, quoting from *Bodinson Mfg. Co.* v. *California E. Com., supra,* 17 Cal.2d 321, 325-326.)

California Code of Regulations, title 2, section 18420, subdivision (b) provides in pertinent part: "The payment by a state or local government agency of the salary or expenses of its employees or agents is an expenditure or contribution only if the salary or expenses are for *campaign activities* . . . ." (Italics added.) Such payments are for campaign activities if services are rendered "for political purposes." (Cal. Code Regs., tit. 2, § 18423,

subd. (a).) *Thirteen Committee* v. *Weinreb, supra,* interprets the phrase "for political purposes" to mean " '[f]or the purpose of *influencing* or *attempting to influence* the action of the *voters* for or against the . . . [qualification or passage of any measure].' (Cal. Admin. Code, tit. 2, § 18225, subd. (a).)" (168 Cal.App.3d at pp. 532-533, italics added.)

This accords fully with the Fair Political Practices Commission's own *interpretation of the act.* In an advisory opinion requested by the Isla Vista community council, the commission notes, " 'measure' includes any proposition 'which is submitted to or is intended to be submitted to a popular vote at an election by initiative . . . whether or not it qualifies for the ballot.' Section 82043. This definition includes not only each initiative . . . that is actually submitted to the voters but also applies to each such proposal that is intended to be submitted to a popular vote whether or not it qualifies for the ballot. Accordingly, an initiative . . . becomes a measure when the proponents begin to circulate signature petitions to qualify the measure for the ballot. . . .

"IVCC's obligations to report expenditures in support of incorporation begin when the proposal becomes a measure . . . . Before that date, IVCC has no reporting obligations because it has not incurred expenditures *in support of* a 'measure.' *After* [it becomes a measure], IVCC must keep records of expenditures and will become a committee after . . . making expenditures of $500 or more in support of the measure. . . ." (In the Matter of Opinion requested by Mark Fontana, Treasurer of the Isla Vista Community Council (1976) 2 FPPC Ops. 25, No. 75-16, pp. 3-4, italics added.) Reporting requirements do extend to expenditures made in anticipation of supporting a proposal once it becomes a measure, however. (*Ibid.,* at p. 4, fn. 5.)

 Prior to and through the drafting stage of a proposed initiative, and even through the identification of a willing proponent, the action is not taken to attempt to influence voters either to qualify or to pass an initiative measure; there is as yet nothing to proceed to either of those stages. The audience at which these activities are directed is not the electorate per se, but only potentially interested private citizens; there is no attempt to persuade or influence *any* vote. (*Miller I, supra,* 87 Cal.App.3d at p. 768.) It follows those activities cannot reasonably be construed as campaigning.

It appears clear it is only expenditures made in *anticipation of supporting* a proposed initiative once it becomes a measure or *made thereafter in supporting* it which come within the reporting requirements of the act. In the instant matter, four areas of activity conceivably may fall within this

category: (1) The drafting for and use by District Attorney Philibosian of the "suggested core speech"; (2) the drafting of the article concerning the preliminary hearing aspects of the initiative; (3) the district attorney's and sheriff's use of county owned vehicles and county paid drivers to attend meetings concerned with advocating and promoting qualification of the proposed initiative; and (4) the board of supervisors' endorsement of qualification of the proposed initiative.

Overall, the "suggested core speech" which Special Assistant Richard J. Chrystie drafted for the district attorney is unequivocally one-sided in tone and clearly is aimed at influencing the electorate in favor of qualifying the proposed initiative. Nonetheless, portions of the speech provide legitimate, valuable information to members of the public in a neutral tone. The stipulated facts state only that the district attorney used part of this text in various speeches he made, *some* of which advocated qualification of the initiative. Therefore, there may be a question as to the expenditure of public funds to influence the electorate in favor of qualification.

While a governmental agency has a legitimate information-dissemination function so long as it employs "a 'fair presentation' of relevant information . . ." (*Stanson* v. *Mott, supra,* 17 Cal.3d at p. 221), the "suggested core speech" unquestionably goes beyond serving that function. Hence, if public facilities, personnel and supplies other than the district attorney's county supplied automobile and driver were used in creating the "suggested core speech," those expenditures would fall within the definition of reportable campaign expenditures, i.e., those designed to influence voters for or against the measure's qualification. (Cal. Code Regs., tit. 2, §§ 18420, subd. (b), 18423, subd. (a).)

However, there is nothing in the record to indicate Mr. Chrystie utilized county resources or supplies in drafting the text or the accompanying memorandum or did so in lieu of performing other duties for which the county compensated him. In the absence of some evidence creation of the text involved the expenditure of public funds in some manner, its political tone is irrelevant.

The article concerning the preliminary hearing aspects of the proposed initiative on which Deputy District Attorney Messer expended four days of his time in lieu of performing other county services, utilizing county resources and supplies in the process, is relatively balanced and neutral in tone. It provides a considerable body of useful information. In sum, it reasonably may be characterized as "a 'fair presentation' of relevant information . . . ." (*Stanson* v. *Mott, supra,* 17 Cal.3d at p. 221.) As such, it was

not designed to influence the voters for or against the qualification of the measure and, hence, did not involve reportable campaign expenditures.

The next question involves the board of supervisors meeting at which it officially recorded its support for qualification of the proposed initiative on November 15, 1983. It is fairly debatable whether the board of supervisors improperly expended public funds in so acting. While Elections Code section 3783 expressly authorizes a board of supervisors to file a written argument for or against any *county* measure and thus would provide sufficient authorization for an expenditure of public funds in officially endorsing such a measure, it clearly provides no such authority with respect to statewide measures. There is no other statutory basis upon which to ground such a power.

California courts have not addressed the issue, but at least one other jurisdiction has found such an endorsement proper in certain circumstances, i.e., when the vote to do so follows a public hearing on a statewide initiative measure at which both the pro and con viewpoints are presented and considered. (*King County Council* v. *Pub. Dis. Com'n.* (1980) 93 Wn.2d 599 [611 P.2d 1227, 1228].) *King County Council* also implies the expenditure of public funds in an official meeting resulting in such an endorsement would not, in any event, be improper. The court distinguishes the county council's activities from those at issue in *Stanson* v. *Mott, supra,* 17 Cal.3d 206, *Citizens to Protect Pub. Funds* v. *Board of Education, supra,* 98 A.2d 673 and *Stern* v. *Kramarsky, supra,* 375 N.Y.S.2d 235, noting: "Unlike *Stanson, Citizens to Protect Public Funds* and *Stern,* the council did not disseminate literature, purchase ads, or allow employees to campaign on work time." (*King County Council, supra,* 611 P.2d at p. 1230.)

We adopt the view that the simple decision, made in the regular course of a board of supervisors meeting which is open to the public and thus the expression of citizens' views, to go on record with such an endorsement in no event entails an improper expenditure of public funds. While it may be construed as the advocacy of but a single viewpoint, there is no genuine effort to persuade the electorate such as that evinced in the activities of disseminating literature, purchasing advertisements or utilizing public employees for campaigning during normal working hours. By the same reasoning, the use of a regularly scheduled board of supervisors meeting to make such an endorsement would not involve reportable campaign expenditures.

This leaves only the district attorney's and sheriff's use of county transportation and drivers to attend meetings in support of the measure. Title 2 of the California Code of Regulations, section 18420, subdivision (c), states

unequivocally: "Notwithstanding subsection (b), the payment of salary or expenses by a state or local government agency to an elected official shall *not* be an expenditure or contribution." (Italics added.) Accordingly, the latter activities also did not involve reportable expenditures. In sum, the trial court did not err in summarily adjudicating this issue. The judgment is affirmed.

Hanson, J., and Devich, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 23, 1988. Eagleson, J., did not participate therein. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.